(Decided June 20th, 1895.)

---

# WILLIAM J. HOOPER et al. vs. THE CENTRAL TRUST COMPANY OF NEW YORK et al.

*Promoters of Corporations—Priorities Between First and Second Mortgage Bondholders—Simulated Payment for Shares of Stock—Vendor's Lien—Waiver—Receivers' Certificates—Liability of Stockholders—Cross-Bill—Bona Fide Purchaser of Bonds.*

Where the promoters of a corporation, by falsely representing to a vendor that improvements of great value will be placed upon the property and paid for, induce such vendor to convey the same to the corporation and accept in part payment second mortgage bonds, so as to let in as a first lien certain first mortgage bonds which are held by the said promoters, who also issue to themselves shares of stock in the corporation upon which they pay nothing, then the lien of such first mortgage cannot obtain priority over the second mortgage for the unpaid purchase money.

Where the promoters of a corporation, by various devices, cause shares of stock to be issued as full paid, as if in consideration of property

acquired by the corporation, when in fact the property was not paid for by the shares, and the same are assigned to the promoters, who also hold the bonds secured by a first mortgage on the estate of the corporation, then such promoters cannot recover as creditors of the corporation and first mortgage bondholders without paying the amount due by them to the company as stockholders, if the rights of a vendor of the property to the corporation are thereby put in jeopardy.

A vendor's lien is not waived by a recital in the deed that the consideration has been paid ; and it prevails against the grantee and his privies in estate and against those claiming as volunteers, or even as purchasers for value, if they have notice that the purchase money remains unpaid.

When the property of a private corporation has been placed in the hands of a receiver, all expenses for safe-keeping and preservation are properly payable out of the income, or if there be none, then out of the proceeds of the *corpus* of the estate when sold.

But this power by no means includes authority in such case to allow the creation of liens through the medium of receivers' certificates which will take priority over existing liens.

A suit by a receiver, or by the creditors of a corporation, to enforce payment of unpaid subscriptions to the capital stock, is governed by the law of the domicil of the corporation.

A cross-bill may set up additional facts not alleged in the original bill, when they constitute part of the same defence and relate to the same subject-matter ; and though the allegations of the cross-bill must relate to the matter of the original bill, it is not restricted to the issues under it.

The promoters of a corporation, through their agents, bought certain land from H., it being agreed that $100,000, being a part of the price, should be paid in second mortgage bonds of the M. Co., to be thereafter formed.  This company's purpose was the manufacture of ice, and the contract with H. provided that machinery, etc., to the value of $130,000, should be placed upon the property.  One of the promoters guaranteed to H. the erection of the machines, and stated that he then had in his hands the funds necessary to pay for the same.  This guaranty was not true and was not performed.  The machines were furnished by the A. Co. under a contract reserving title to that company until payment of the price.  Upon the faith of the guaranty H. executed a deed to the M. Co. of the property, and that company then executed two mortgages to a Trust Co.—the first to secure an issue of $250,000 of M. Co.'s bonds, and the second to secure an issue of $110,000 of bonds. Of these latter second mortgage bonds. $100,000 were given to H. in pursuance of the contract of purchase, and $10,000 in settlement of another transaction.   The M. Co. issued shares of stock of the par value of $500,000, stated to be issued for

property purchased, but upon which, in fact, nothing was paid, the property having been purchased partly with money and partly with the $100,000 second mortgage bonds. All of the shares of stock were assigned to the different promoters and their agents, and the said promoters were also the holders of the first mortgage bonds. Default having been made in the payment of interest on these bonds, the Trust Co., on behalf of the holders of the same, filed a bill for a receiver and foreclosure and sale, to which the M. Co. consented. Under this bill a receiver was appointed, who managed the affairs of the company and issued certificates of indebtedness. The A. Co., which had erected machinery on the mortgaged premises, intervened in the case and obtained a decree for the payment of its claim, the Court holding that the first mortgage bondholders were not *bona fide* purchasers without notice of the contract with the A. Co., but that the same was made by their agents. Some of the promoters paid the A. Co. and took an assignment of its decree against the M. Co. H., the holder of the second mortgage bonds, then came into the case by petition and filed a cross-bill and answer, claiming that the holders of the first mortgage bonds were not entitled to priority over the second mortgage bonds, so issued for the purchase money of the property, and that the first mortgage bondholders should be required to pay the amount due by them as stockholders in excess of the sum due to them on their bonds. *Held,*

1st. That the first mortgage bondholders were not *bona fide* purchasers of the bonds without notice, but were the real purchasers of the property and owe to the vendor the balance of the purchase money, and that since they induced the vendor to waive his lien in favor of the first mortgage bonds by the false representations contained in the guaranty, they cannot now claim a preference over the lien of the second mortgage bonds.

2nd. That the first mortgage bondholders are not entitled to a preference to the extent of the decree assigned to them by the A. Co., as against H., since they were really the debtors of the A. Co. and simply paid their own debt.

3rd. That a decree should be passed for the sale of the mortgaged property, and giving to the second mortgage bondholders, in the distribution of the proceeds, a priority, to the extent of $100,000 and interest, and interest on overdue interest, over the first mortgage bonds, and also priority over the receivers' certificates and the decree of the A. Co. assigned to the first mortgage bondholders.

Appeal from a *pro forma* decree of the Circuit Court of Baltimore City. The case is stated in the opinion of the Court.

The cause was argued before BRYAN, McSHERRY, FOW-LER, PAGE, ROBERTS and BOYD, JJ.

*John Prentiss Poe, Attorney-General,* and *Frank Gosnell* (with whom was *T. M. Lanahan* on the brief), for the appellants.

Appellants contend that the *pro forma* decree of the Circuit Court was erroneously passed and should be reversed, for the following reasons: 1. Because 4,990 of the 5,000 shares of the capital stock of the Maryland Ice Company was fraudulently issued as full paid stock, a large block of which is now, and always has been, held by the London Company and Poor & Greenough, who have never paid one dollar to the Maryland Company for the same, and therefore the amount thereof should be collected by the receiver and applied to the payment of the first mortgage bonds of said Maryland Ice Company, held by them, and said bonds to that extent decreed to be paid and extinguished. *Crawford* v. *Rohr*, 59 Md. 604–5 ; *Mish* v. *Main*, 81 Md. ; *Sawyer* v. *Hoag*, 17 Wall. 610 ; *Camden* v. *Stuart*, 144 U. S. 105 ; *Lloyd* v. *Preston*, 146 U. S. 630 ; *Wetherbee* v. *Baker*, 35 N. J. Eq. (8 Stewart) 501-515 ; *Rice's Appeal*, *Ahl's Appeal*, 79 Pa. St. 168

The gross fraud perpetrated upon the public by the London Company and Poor & Greenough in organizing the Maryland Ice Company, and causing it to issue its bonds and stock to the extent of $860,000 for property which cost but $260,000, an over-valuation of more than 330 per cent., is only excelled by their audacity and assurance in offering the evidence of Sturgis, Greenough and Hammond, recently taken in this case for the purpose of creating the false impression that the London Company and Poor & Greenough *were not* among the associates of Hammond in making the purchase from the appellants, and had no connection with the Maryland Ice Company, except as *purchasers* of bonds and stocks, notwithstanding that this Court had already solemnly determined the contrary from the conclusive evidence, documentary and oral, appearing in the first record.

2. The second proposition contended for by the appellants is, that having been induced to part with the legal title to the property in controversy, and having consented to take a second mortgage for the balance of the purchase money, *upon condition* and with the *distinct covenant* and *agreement* made by the purchasers of the property that the second mortgage *should be·secured* by placing upon the property, *on or before the 1st day of July, 1890,* new machinery, etc., costing from $130,000 to $150,000, which undertaking was not complied with—and by reason whereof the corporation was placed in the hands of a receiver, and the claim of the second mortgage bondholders seriously, if not wholly impaired—they, the appellants, are entitled to be subrogated to the rights of the holders of all of the first mortgage bonds and holders of all the receivers' certificates, who were in fact themselves the purchasers of the property, as already *adjudicated* by this Court.

The evidence adduced by these first mortgage bondholders, who are also the stockholders, is that, had the new machinery been placed upon the property at the time and in the manner agreed upon by the Arctic Ice Machine Manufacturing Company, the property would have been enhanced in value to the extent of at least $500,000, the whole issue of the common stock; in fact, these bondholders and stockholders actually now claim that this was the foundation for issuing that amount of stock as fully paid up and non-assessable. This aspect of the case is so fully covered by the discussion of the first proposition and the authorities cited, that it seems almost unnecessary to go over the grounds again. The position of the appellees is monstrous, that they should get possession of our property, induce us to take·second mortgage bonds in part payment, *coupled with the condition* that these bonds should be secured beyond doubt by the erection of new machinery, &c., within a certain specified period, and then, because the parties with whom the purchasers contracted for such machinery make default, that appellants' claim shall be lost

It is but just and equitable that the appellants' claim should be decreed to be paid by postponing the lien of the first mortgage. There is no obstacle in the way of accomplishing this, as the parties who are now claiming a prior lien were the purchasers of the property, and contracted that such additional machinery, improvements, &c., should be placed thereon, as would ensure, beyond a doubt, the payment of the second mortgage bonds. The following authorities fully sustain this contention: *Fisher* v. *Shropshire*, 147 U. S. 133, 140, 141 ; *Slide & Spur Gold Mines* v. *Seymour*, 153 U. S. 509 ; *McDole* v. *Purdy*, 23 Iowa, 277 ; *Brown* v. *Bryan*, 65 Iowa, 374 ; *Huff* v. *Olmstead*, 67 Iowa, 598 ; *Yeoman* v. *Bell*, 29 N. Y. Supplement, 502 ; *Railroad Co.* v. *Lewton*, 20 Ohio St. 401 ; *Hooper* v. *Railway Co.*, 69 Ala. 529 ; *Florida Land and Imp. Co.* v. *Merrill*, 2 U. S. App. 434.

As to the receivers' certificates, it is conceded that they were issued without the consent of, and without prejudice to the rights of the appellants; consequently, the second mortgage bonds remain unimpaired thereby.

But apart from the " concession," the certificates are not liens upon the property prior to the appellants' mortgage, because the Circuit Court was without power to authorize their issue, the Maryland Ice Company being purely a private corporation.

*John H. Thomas*, for the Central Trust Company, appellee.

These stockholders had no connection with the Ice Company, except as purchasers of its bonds and stocks, and as supervisors of the organization, for the purpose of seeing that those bonds and stocks should be secured by its charter and resolutions. They made no contract with the appellants. They bought no property from the appellants. They assumed no liability to the appellants. If the Ice Company is not a valid corporation ; if the resolutions under which its bonds, the foundation of the appellants' alleged claim, and its stock, the foundation of the stock-

holders' alleged liabilities, were issued, are not valid, as contracts and acts of that corporation, then those bonds, the alleged foundation of the appellants' claim, and those stocks, the foundations of the alleged liabilities of the Investment Corporation and of Poor & Greenough, are all void, and the effort made in this proceeding to enforce against them such alleged liabilities, must therefore fail.

A stockholder of a corporation is not liable as such to any of the creditors of the corporation, except those who became such *while he was a stockholder*. *Weber* v. *Fickey*, 47 Md. 196; 52 Md. 500; *Coit* v. *Gold Am. Co.*, 119 U. S. 347 ; *Clark* v. *Beaver*, 139 U. S. 107 ; *Fogg* v. *Blair*, 139 U. S. 126; *Fort Nead. Bank* v. *Holden*, 129 U. S. 372 ; *Handley* v. *Stutz*, 139 U. S. 432.

The appellants did not rely on any individual liability of stockholders of the Ice Company, as part of their security. It is not necessary for the appellees, here, to contend that corporate creditors must prove, affirmatively, that they did rely on the liability of the stockholders. It has been affirmatively proven, in this case, that they *did not*.  They contracted that no such liability should exist.  These facts surely constitute a complete defence to the effort now made in these proceedings to enforce against the stockholders any alleged liabilities.

The appellants contracted to receive, *in payment for the property* they sold, $150,000 in cash, and $110,000 in second mortgage bonds.  They have received the cash and bonds.  Hammond has fully complied with his part of the contract, and the appellants have, as he contracted with the Ice Company that they should, executed a deed to that company.  The appellants relied exclusively on their second mortgage and the corporate liability of the Ice Company therefor ; not on any stockholder's liability.  They stipulated that the first mortgage, which had priority over the second, should not exceed $250,000 ; that additional machinery, to the extent of from $130,000 to $150,000, should be erected on the property, so as to render it suffi

cient security for their mortgage.   They would not execute
their deed until they received from Poor & Greenough the
letter and postscript set forth in evidence.   If the property
was worth only $250,000, for which they sold it, the mini-
mum of stipulated improvements, would make it worth, at
least, $390,000.   This is $140,000 more than the first
mortgage ; leaving a margin of $30,000 over and above
their second mortgage, of $110,000, as security for the
latter.   The bonds contain an express agreement, that the
holders of them shall not be entitled to assert against the
stockholders of the Ice Company, any individual liability,
on account of those bonds.   The appellants accepted those
bonds, with that agreement, as part of them ; have had
them registered in their names ; have kept them for over
four years, and still keep them, with the authority of the
Orphans' Court, as part of the estate of their testator ; re-
ceived payment of two semi-annual coupons ; as long as
the Ice Company was able to pay interest ; and have ac-
counted for such interest, and distributed it among the
beneficiaries under the will of their testator, as part of the
income of their testator's estate.   It is, surely, too late now
to contend that any of the provisions of those bonds are
void as against the holders of them.   Corporate creditors
may waive their rights, if they would otherwise have any,
to the individual liability of stockholders. 1 *Cook on Stocks,
&c.*, section 216.

If it be contended that, under the contract of sale, the
appellants are entitled to bonds of the Ice Company, in the
ordinary form, without any stipulation that stockholders
shall not be liable thereon, the reply is, that the contract of
sale entitles the appellants to second mortgage bonds.   It
does not provide that such bonds shall not contain a stipu-
lation, exempting the stockholders of the company from
liability therefor.   Bonds of the Ice Company, with the
stipulations which they contain, exempting stockholders
from liability therefor, are as much bonds of that company
as if they had contained no such stipulation.

A further reply to the contention that the appellants had rights, under their contract of sale, prior to the execution of the bonds, which affect the liability of the Investment Corporation and of Poor & Greenough is, that the Ice Company had not then been chartered. There were, then, no shareholders. Under the authorities hereinbefore referred to, the Investment Corporation and Poor & Greenough could not be individually responsible to the appellants, by reason of that contract. Another, and it is submitted, conclusive reply to such contention is that the Ice Company did not buy the property from the appellants. It *took title* from them, but *it bought* from Hammond. There was no resolution of the board of directors or of the stockholders which authorized the Ice Company to be substituted as purchaser from the appellants to the rights and liabilities of Hammond. The petition to the Orphans' Court, filed in the name of the Ice Company, was not authorized by any resolution of the directors or stockholders of that company. It was not authorized to contract, and did not contract any liability to the appellants, otherwise than by its bonds, executed by authority of the resolutions passed by the directors and stockholders in the forms prescribed by those resolutions. Those bonds exempt the stockholders from any liability therefor. They prohibit the holders from asserting such liability. A still further reply is, that the appellants' petition ; their cross-bill ; their answer ; all of their pleadings, claim as holders of these bonds. They are estopped from setting up any claim, in conflict with the above-mentioned provision therein.

The rights of creditors of a corporation to recover from a stockholder depend, in the absence of fraud on the part of the stockholders, entirely on the *contract between him and the corporation.* They are entitled to sequester for their benefit what he owes to the corporation. If he owes nothing to it they can recover nothing. Their rights against him depend on the same circumstances as those of the corporation against him, and are subject to the same limitations.

The decisions about to be referred to, in the New Jersey Courts and the Supreme Court of the United States, as to the difference between liabilities of those who subscribe for stock, or become transferees of subscribers; and those of stockholders who acquire "full paid stock" issued for "property purchased," are logical · deductions from, and legitimate illustrations of this principle. ·They all decide, and the law seems well established, that the holder of stock, issued for "property purchased," is not liable to corporate creditors, unless there was actual fraud in the transaction. *Cook on Stockholders*, (3d ed.,) vol. 1, page 47, section 35; *Bickley* v. *Schlag*, 46 N. J. Eq. 533; *Clark* v. *Bever*, 139 U. S. 97; *Van Cott* v. *Van Brunt*, 82 N. Y. 535; *Handley* v. *Slutz*, 139 U. S. 417.

As to the distinction between the liability of subscribers for stock and that of those who take stock, in good faith, in satisfaction of their demands, or for property purchased, see also *Camden* v. *Stewart*, 144 U. S. 105; *Memphis, &c., R. R. Co.* v. *Dow*, 120 U. S. 287; *Fort Madison Bank* v. *Alden*, 129 U. S. 372-8-9.

Even if the amount fixed upon as the proper amount of capital stock, on this basis, was inordinately large, and the property was improperly accepted for the bonds and stock, the appellants were not injured; still less were they defrauded thereby. They cannot, on that ground, hold stockholders responsible for corporate debts. Purchasers of the stock might complain. But none of them do. *In re Ambrose Lake Tin and Copper Co.*, L. R. 14 Ch. Div. 390; *Commonwealth* v. *Central Passenger Railway*, 52 Pa. St. 515; 1 *Cook on Stock, &c.*, section 46 and notes; *Granite Roofing Co.* v. *Michael*, 54 Md. 65-9 and 70.

The New Jersey Statute provides special means for enforcing liabilities, if any, of stockholders to corporate creditors. *Corporation Acts of New Jersey*, page 42, sections 93–4; *Weatherby* v. *Baker*, 35 N. J. Eq. 507; *Bickley* v. *Schlag*, 46 N. J. Eq. 532; 1 *Cook on Stock, &c.*, sections 220-24. These liabilities, if any, being the creatures of

statute, the modes provided by the statute, which created
them, for the enforcement of them, must be pursued. They
are exclusive of all others. *Weatherby* v. *Baker*, 35 N. J.
Eq. 507; *Bickley* v. *Schlag*, 46 N. J. Eq. 532; *Pollard* v.
*Baily*, 20 Wall. 527; *Fourth Nat. Bank of N. Y.* v. *Frank-
lyn*, 120 U. S. 747, 755-6-7-8; 1 *Cook on Stock, &c.*, sec-
tions 220-23-24.

The Investment Corporation and Poor & Greenough are
not parties to these proceedings. The question of their
alleged liabilities cannot properly be adjudicated in them.
That can only be adjudicated in such actions, against them
*in personam*, as are authorized by the New Jersey Statutes.
The appellants may maintain such actions against them, if
there be grounds therefor. The receiver cannot, even by
authority of the Court. 1 *Cook on Stocks &c.*, section 218.

*Wm. Pinkney Whyte* and *Randolph Barton* (with whom
was *Skipwith Wilmer* on the brief), for the Maryland Ice
Company, appellee.

McSHERRY, J., delivered the opinion of the Court.

On March the twenty-first, eighteen hundred and ninety,
the Maryland Ice Company was incorporated under the laws
of the State of New Jersey. On the following fifth of April
the Company acquired certain property situated in Balti-
more City from the executors of the estate of the late Wil-
liam E. Hooper, deceased; and it acquired this property
under an agreement previously made between the executors
and Ormond Hammond, Jr., who contracted for himself
and his undisclosed associates. The circumstances attend-
ing this acquisition of property will be stated later on. The
price agreed to be paid was one hundred and fifty thousand
dollars in cash (of which five thousand dollars were paid
when the agreement was executed) and one hundred thou-
sand dollars in second mortgage bonds of a company to be
formed thereafter, which company, when formed, was the
Maryland Ice Company.

In the contract of purchase, which bore date February the twenty-eighth, eighteen hundred and ninety, there were stipulations requiring the construction by the purchaser and his associates of certain betterments and ice manufacturing machinery upon the premises, to the value of one hundred and thirty to one hundred and fifty thousand dollars, to be erected by a designated time and to have a prescribed ice-producing capacity. Simultaneously with the execution of the deed by the executors conveying the property to the Maryland Ice Company the latter placed upon record two mortgages to the Central Trust Company of New York, each dated on the first of March and acknowledged on the third of April, and each covering the property so conveyed to the Maryland Ice Company by the Hoopers, and also covering all additions thereto and all machinery thereafter to be placed thereon. The first of these two mortgages secured an issue of two hundred and fifty thousand dollars of the Maryland Ice Company's bonds, and the second secured an issue of one hundred and ten thousand dollars of other bonds of the same company. These latter were delivered to the executors; one hundred thousand dollars of them in part payment of the purchase money as provided in the contract of February the twenty-eighth, and ten thousand dollars of them in settlement of another' transaction which has no connection with the pending controversy. Prior to the incorporation of the Maryland Ice Company, Ormond Hammond, Jr., and Thomas Sturgis, acting for and in behalf of the promoters of the enterprise which finally culminated in the formation of the Maryland Ice Company, entered into a contract with the Arctic Ice Machine Manufacturing Company for the construction of three ice manufacturing machines to be placed upon this property. In the contract so executed on March the fifteenth, 1890, there was a clause expressly reserving to the Arctic Company the title in these machines, and the right to reclaim and remove them if the purchase price should not be paid when due. This contract was assigned to

the Maryland Ice Company after its incorporation. The machines were, after some delay, finally erected, but were not fully paid for. The Maryland Ice Company having made default on September the first, 1891, in the payment of the interest coupon due that day on its first mortgage bonds, the Central Trust Company, representing and acting for the holders of those bonds, filed on the following day, in the Circuit Court of Baltimore City, a bill for the foreclosure of the first mortgage, and for a sale of the property, including the machines constructed by the Arctic Company, and which had not been fully paid for by the Maryland Ice Company. With the bill there was filed the unsworn answer of the Maryland Ice Company, consenting to a sale, and agreeing that a receiver be forthwith appointed. On the same day a decree was signed appointing O. Hammond, Jr., receiver, and enjoining the Maryland Ice Company and all persons from selling or disposing of any of the company's property. This whole proceeding, though ostensibly between different parties, occupying opposite sides of the docket, was, in fact, conducted by the same individuals, who, under other names, controlled both sides of the apparent controversy, because the Trust Company, the plaintiff, acted at the instance and in behalf of the first mortgage bondholders, and the Maryland Ice Company, the defendant, represented its stockholders, who were the same identical bondholders and their agents and co-projectors of the original undertaking. After the appointment of the receiver the Arctic Company intervened by petition, and asserted under the contract of March the fifteenth, 1890, made with Hammond and Sturgis, its ownership of the machines erected by it, but which had not been fully paid for. This claim was resisted by the first mortgage bondholders, on the ground that they were *bona fide* purchasers of those bonds, without notice of the unrecorded conditional sale made by the Arctic Company of the three ice-manufacturing machines. Whilst that controversy was pending, no further steps were taken with reference to

the foreclosure and sale. Ultimately the point at issue between the first mortgage bondholders, represented by the Central Trust Company, and the Arctic Company, reached this Court, and the case is reported in 77 Md. 202. Bearing in mind that the precise question controverted between the contending parties to that appeal was whether the holders of the first mortgage bonds were in fact *bona fide* purchasers thereof, without notice or knowledge of the title set up by the Arctic Company to the three machines erected by it under the contract made by Hammond and Sturgis on March the fifteenth, 1890, the pertinency of the conclusions reached on that subject in that case to the questions involved in the pending appeal, will be apparent. After a full, able and elaborate argument at the bar, we held that the London and New York Investment corporation and Poor & Greenough, who, it then appeared, together owned two hundred and forty-five thousand of the two hundred and fifty thousand dollars of the first mortgage bonds of the Maryland Company, and who, it now appears, between them own the entire issue, were in fact with Hammond and Sturgis the actual promoters of the scheme which resulted in the purchase of the property from the Hoopers, the making of the contract with the Arctic Company, the formation of the Maryland Ice Company and the issue of its first and second mortgage bonds. It was distinctly decided that the London corporation and Poor & Greenough had notice and knowledge of the provisions of the contract between the executors of Hooper on the one hand and Hammond on the other, wherein the latter agreed in behalf of himself and his associates that the betterments, to cost from one hundred and thirty to one hundred and fifty thousand dollars, should be placed upon the property; that they knew how and by what means the Hoopers were to be paid the amount of the agreed purchase money, and that they further knew the provisions of the contract between Hammond and Sturgis and the Arctic Company, which was subsequently assigned to the Maryland Ice Company. And

they were held to have known these facts because, in the opinion of this Court, the London and New York Investment Corporation and Poor & Greenough were the real parties to these several contracts executed in their behalf by their accredited agents, Hammond and Sturgis. " It was," we said in 77 Md. 231, " for the London corporation, and at its instance, that Hammond negotiated the purchase with Hooper, and it was for it and for its benefit that he incurred the obligation to erect the three additional machines thereon ; and it was to advance its interests that he and Sturgis entered into the contract with the Arctic Company. He and Sturgis were, therefore, in fact the agents of that corporation employed to develop the project for it, and the attempts to disguise their real connection with the London corporation are, whilst numerous and adroit, none the less transparent and obvious. * * * * * The priority asserted by the Central Trust Company for the holders of the Maryland Ice Company's first mortgage bonds is a priority claimed in behalf of the very persons whose agents and associates purchased the machines and contracted for the preservation of the vendor's lien thereon. The London corporation and Poor & Greenough, who are stockholders of the Maryland company, claim, as creditors of the very company which they organized and control, and whose obligations they were aware of, a priority over the vendor of the machines, notwithstanding the knowledge and information which they had and were chargeable with when they took the bonds, and notwithstanding the fact that the very priority which they are now seeking to defeat was one created by their own agents even before the bonds were issued. No Court has ever yet held that parties thus situated could successfully maintain such a position. It is the worst of bad faith." * * " As bondholders they have no standing to destroy or to impair the lien which, as projectors of the company, they through their own agents established in favor of some one else." Page 234.

Under the contract between Hammond and the Hoopers,

of February the twenty-eighth, 1890, it was stipulated that Hammond should furnish a guaranty from Poor & Greenough, bankers, of New York, that the betterments and additional machinery provided for would be placed upon the property on or before the first day of the succeeding July. The object which the Hoopers had in view in insisting on these betterments is obvious. They desired to add to the security of the second mortgage bonds, which, in consideration of these betterments and improvements being made, they agreed to take as part of the purchase price for the property. And the object which the purchasers obviously had in view in giving the guaranty was to induce the vendors to waive their lien for the unpaid purchase money, so as to let in the first mortgage as a prior lien. Accordingly, before the delivery, and as a condition of the delivery by the vendors of the deed to the Maryland Ice Company, which had just been substituted in the executors' report of sales to the Orphans' Court as purchaser of the property in the place and stead of Hammond and his associates, who made the contract of purchase in contemplation of the incorporation of the company ; and before the grantors waived their vendor's lien in favor of the first mortgage bonds, a guaranty in the words hereinafter set forth was signed by Poor & Greenough and was given to the Hoopers.

Having determined in 77 Md. that the holders of the first mortgage bonds (who together with Sturgis and Lane are also the holders of the stock of the Maryland Ice Company) were not *bona fide* purchasers of those bonds without notice of the claim or lien of the Arctic Company, and that they were accordingly bound by the provisions in the latter company's contract of March the fifteenth, 1890, and were subordinated to the vendor's lien asserted by that company ; the case was remanded for further proceedings and proof respecting another branch of the controversy. It came here twice afterwards. 79 Md. 103, and 80 Md. xviii; and when the amount due to the Arctic Company was finally and defi-

nitely settled, a portion of it was paid and fifty thousand dollars of it were advanced by the London corporation, which took from the Arctic Company an assignment of the latter company's decree to that extent. Whether this decree in the hands of the London corporation under the assignment from the Arctic Company is a prior lien to that of the second mortgage, is one of the questions involved in the pending appeal.

From the day the original bill was filed down until about the sixth day of June, 1893, various sums were borrowed by the receiver on certificates issued under authority conferred by the Circuit Court. The money, aggregating over ninety thousand dollars, was furnished by the London corporation. The Hoopers, who held then and still hold the second mortgage bonds, never assented to the issuing of these certificates. Whether these receiver certificates held by the London corporation are a prior lien to the second mortgage, is another of the questions now before us for decision.

After the controversy between the Arctic Company on the one side, and the holders of the first mortgage bonds and the Maryland Ice Company on the other side, had been finally disposed of as above stated, the Hoopers, still holding the one hundred and ten thousand dollars of second mortgage bonds, came into the foreclosure proceeding case by petition and were finally made parties defendants. They obtained leave to file and did file a cross-bill, and they also answered the original bill. They incorporated the averments and statements of the cross-bill in their answer as parts thereof; and by both answer and cross-bill they insist that the holders of the first mortgage bonds are not entitled to a priority over the holders of the second mortgage bonds, for reasons to be stated later on; and they further claim that before the holders of the first mortgage bonds shall be allowed any part of the proceeds which may arise from a sale of the mortgaged premises they, the first mortgage bondholders, shall, as stockholders of the Maryland Ice

Company, pay to the receiver thereof the sum which the par value of the stock held by them amounts to in excess of the sum due to them on the first mortgage bonds. And these are the other questions presented on this appeal. The cross-bill concludes with a prayer for general relief, and it was answered by the Central Trust Company, by the Maryland Ice Company and by Hammond, the receiver. Considerable testimony was taken, and thereafter the cross-bill was dismissed by a *pro forma* decree, from which the pending appeal was taken.

At the outset, it is insisted that the relief sought by the cross-bill is so foreign to and irreconcilable with that which the original bill invoked, that the *pro forma* decree should, for that reason, be affirmed. It is undoubtedly true that a subject which is not germane to a pending controversy cannot by means of a cross-bill be injected into the litigation. A cross-bill is a mere auxiliary suit, and a dependency of the original. *Story Eq. Pl.*, sec. 399. Where a decree on the plaintiff's bill will not determine the litigation, the imperfection may be remedied by one or more cross-bills filed by one or more of the defendants against the plaintiffs; and if this has not been done and the difficulty appears at the hearing, the cause may be directed to stand over for the purpose. *Adams' Eq.*, side-page, 402. The cross-bill may set up additional facts not alleged in the original bill where they constitute part of the same defence, and relate to the same subject-matter. *Underhill* v. *VanCortland*, 2 Johns C. R. 355. And though its allegations must relate to the subject-matter of the original bill, it is not restricted to the issues under it. *Nelson* v. *Dunn*, 15 Ala. 501. It is generally considered as a defence, or as a proceeding to procure a complete determination of a matter already in litigation in the Court, and therefore the plaintiff is not, at least as against the plaintiff in the original bill, obliged to show any ground of equity to support the jurisdiction of the Court. *Adams' Eq.*, side page 405; *Story Eq. Pl.*, sec. 399; *Mitf. Eq. Pl.*, by *Jeremy*, 80–83. But the answer

specifically relies, by way of defence to the original bill, upon the same matters set forth in the cross-bill, and these, if sustained, present an insuperable bar to the relief prayed in the original bill filed by the Central Trust Company, in so far forth as respects the alleged priority of the first mortgage bonds. With a single exception which will be adverted to hereafter, the relief sought, or the defence relied on in the cross-bill, is necessary to a complete determination of the relative priorities of the several liens now asserted; and that issue as to these priorities, which is of vital importance in the controversy, cannot be adjusted under the original bill, unaided by the cross-bill.

As we have stated, the original bill was filed to procure a foreclosure of the first mortgage, and it prayed that the proceeds of the foreclosure sale might be applied to the payment of the principal and interest unpaid upon the first mortgage bonds, together with interest on overdue interest down to the time of sale; and then, if there should be any surplus, that it should be applied to the payment of the second mortgage bonds. Now, the defences set up and relied on by the appellants present insuperable obstacles to the granting of so much of this relief as would give the first mortgage bondholders a preference over the second mortgage bonds. These defences, set up in the cross-bill and in the answer, assail the priority of the receivers' certificates, the priority of the Arctic Company's decree in the hands of the London Corporation, and finally the priority of the first mortgage bonds in the hands of that corporation, and in the hands of Poor & Greenough.

If the holders of the first mortgage bonds by any fraudulent device procured for their own benefit the execution and delivery of the deed by the Hoopers for the mortgaged property, and by the same means and for their own advantage secured a waiver by the grantors of their lien for the unpaid purchase money so as to let in the first mortgage as the first lien; then, upon the plainest principles of natural justice, they will not be allowed in a Court of Equity to en-

force this lien of their own creation in their own favor to the prejudice of, or even in preference to, the lien of the vendors for the purchase money represented by the second mortgage bonds ; even though the second mortgage bonds on their face declare that issue to be subject to the lien of the first.    It is scarcely necessary to cite adjudged cases in support of a proposition so plain and self-evident as this. Courts of Equity will never allow the mere *form* in which a transaction is clothed or disguised by the parties who have projected it for their own gain, to control or defeat the legal or equitable rights of others ; particularly where an adherence to *form* and a disregard of *substance* would result in the successful consummation of a palpably fraudulent scheme.    1 *Pom. Eq.*, sec. 379.

To fully appreciate the relevancy of the defences made by the cross-bill and by the answer, we must rapidly sketch the further connection of these first mortgage bondholders with the Maryland Ice Company enterprise, and trace them through its various developments down to the present period.

After the contract of February the twenty-eighth, 1890, had been made, containing the stipulation respecting betterments and additional machinery, and the further stipulation providing for the guaranty by Poor & Greenough ; and there had been inserted in the deed of April the fifth a recital with regard to the contemplated betterments, which recital, embodying the agreement in this particular of the projectors, became, in fact, a part of the consideration of the conveyance; the further organization and . development of the Maryland Ice Company was progressed with.    The London corporation, Poor & Greenough and Sturgis, fixed the capital stock of the company at five hundred thousand dollars, not one dollar on which has ever been paid by them or by any one else, except possibly one thousand dollars for ten shares put in the names of five individuals on March the twenty-fourth, 1890, for the purpose of effecting a formal organization.    As one of the methods re-

sorted to for the purpose of concealing or cloaking the real
transaction, an agreement was entered into between Ham-
mond and the London corporation, on the fourth of March,
eighteen hundred and ninety, whereby he contracted to
turn over to the Maryland Ice Company, when formed, the
property purchased four days previously from the Hoopers;
and to so turn it over for two hundred and fifty thousand
dollars of first, and one hundred and ten thousand dollars
of second mortgage bonds and five hundred thousand dol-
lars of stock; but not one of the bonds went into his hands
or was ever intended to go there, and a certificate for four
thousand nine hundred and ninety shares of stock remain-
ing after ten had been issued as just stated, was nominally
issued to him, but in fact was merely handed to him with a
request that he sign a transfer in blank on its back.   This
transfer he signed as directed, and it now appears filled out
as an assignment of one thousand shares to the London
corporation; four hundred and forty 'shares to Poor &
Greenough; one thousand shares to Greenough, trustee;
eight hundred and fifty shares to Sturgis; eight hundred
and fifty shares to W. C. Lane, and eight hundred and fifty
shares to Hammond.   Only a few days subsequently a cer-
tificate for eight hundred and fifty shares was presented
to Hammond by Sturgis with a request that he as-
sign that also in blank, which was done, and it was
then returned to Sturgis, and Hammond never saw it
afterwards.   No money or other consideration of any kind
was paid to Hammond for this stock by the parties who
received it; nor did Hammond ever pay or give to the
Maryland Ice Company anything for it himself.   As in fact
the stock, with the exception of the ten shares before alluded
to, all went to the promoters of the concern precisely as it
was intended that it should go from the beginning, there
was nothing due to Hammond for it, and consequently
nothing was paid or given him.   So completely was he a
mere figurehead that even the five thousand dollars paid to
the Hoopers when the contract of February the twenty-

eighth was made, was paid through Sturgis by the London corporation. The stock purports to be full-paid, non-assessable stock, and professes on its face to have been "issued for property purchased." The property, however, was purchased for two hundred and fifty thousand dollars through Hammond, but by the very parties who procured the stock; and the stock was not issued for the purchase at all, and no part of it was used therefor. The purchasers of the property—the London corporation, Poor & Greenough and Sturgis—through their selected representatives, who held the ten shares, voted that the stock be issued to Hammond, merely that he might immediately transfer it back to them; and this he did. Thus in effect they issued it, through a crafty device, to themselves as full-paid, non-assessable stock, though they paid nothing for it at all. They consequently owe the Maryland Ice Company for this stock, and by no subterfuge or artifice, however cunning, can they evade their liability in this respect when that liability is sought to be fastened upon them by a party entitled to resort to it to secure payment of a claim due by the Maryland Company. "It has again and again been decided that the unpaid subscriptions to the capital stock of a corporation constitute a trust fund for the benefit of the general creditors of the corporation; and that this trust cannot be defeated or the fund impaired by a simulated or pretended payment for the stock taken, nor by any device short of actual payment in good faith. Any arrangement, therefore, among the stockholders or those in charge of the affairs of the corporation, by which the stock is but nominally paid for, whether in money or property, the corporation not, in fact, getting the benefit of the price in good faith, will be regarded as a sham, and not a valid payment, as against the creditors of the corporation, however it may be regarded as between the corporation and the subscribers." *Crawford, Bixler et al.* v. *Rorer*, 59 Md. 604; *Camden* v. *Stuart*, 144 U. S. 105; *Floyd* v. *Preston*, 146 U. S. 630; *Washburn* v. *Green*, 133 U. S. 30; *Hatch* v. *Dana*, 101 U.

S. 205. As against a creditor of the Maryland Ice Company, this acquisition of alleged full-paid, non-assessable stock, without the payment of a single cent, would be grossly fraudulent; and to permit holders of such stock, who, as promoters of the company, occupied the position of agents in procuring for the projected company the property upon which its mortgages were afterwards fastened, to claim and recover in the capacity of first mortgage bond-holding creditors of that company, *from* that company, an amount equal to the sum due by them *to* the same company, and due in their capacity of stockholders for stock actually issued, but not paid for, without requiring them first to pay what they themselves owe, would be a flagrant injustice to the vendors of the mortgaged property, if the lien of the latter for unpaid purchase money were thereby put in jeopardy. It is true as a general principle that to render a stockholder individually liable to the extent of his unpaid subscription, at the suit of a creditor of the corporation upon a debt due by the corporation to the creditor, the stockholder must have been such at the time the debt was contracted. *Weber* v. *Fickey, use of Lanahan,* 47 Md. 196; S. C. 52 Md. 500; *Handly* v. *Stutz,* 139 U. S. 417; *First Nat. Bk. of Deadwood* v. *Gustin-Minerva Cons. Mining Co.,* 42 Minn. 327, S. C. 6 L. R. A. 676; *Hahn & Bros. Appeal,* 5 Cent. R. 187 ; *Morawetz on Corp.,* secs. 832, 833. But we are not confronted with that question, because no decree is asked against the stockholders to require them to pay the second mortgage bonds ; but merely a decree directing the receiver to collect the unpaid subscriptions to be applied by the Maryland Ice Company, when collected, to the extinguishment of the first mortgage bonds. Nor, for the same reason, does the provision in the second mortgage bonds to the effect that no liability on that bond shall ever be enforced against the individual estate of any stockholder of the Maryland Ice Company, interpose any difficulty as the case now stands. If suits should be brought hereafter by the receiver or by creditors to enforce payment for these unpaid shares, the

law of the corporation's domicile would govern and con-
trol. *First Nat. Bk. of Deadwood* v. *Gustin Minerva Co.*,
*supra.*   But this branch of the subject is not before us now
and need not be discussed, because this feature of the re-
lief sought by the cross-bill is obviously foreign to the ob-
ject of the original bill, and such relief could not properly
be granted in the pending proceeding, though the improvi-
dent joinder of this particular subject will not affect the
jurisdiction of the Court to decree relief as to the subjects
which are properly included in the cross-bill.   *Code*, Art.
16, sec. 161.   The fact of the indebtedness to the Maryland
Ice Company, by its first mortgage bondholders in their
capacity as its stockholders, whilst furnishing no ground in
this proceeding for a decree directing the receiver to col-
lect the amounts not paid on the stock, is a circumstance
which reflects strongly in a Court of Equity on the good
faith of these same bondholders in pressing for a sale of
the mortgaged property whilst they are largely indebted to
the company ; and it is a circumstance which exhibits them
in the light of attempting to shut out the second mortgage
altogether at the very time when, being thus indebted, they
are seeking equitable relief in their own behalf, though re-
fusing to do equity themselves.   These first mortgage bond-
holders are the real plaintiffs to the original bill.   They
were in fact the real purchasers of the property bought
from the Hoopers.   They were the promoters of the Mary-
land Company, and though they did not get possession of
the certificates of stock until April the seventh, 1890, yet,
under the contract of March the fourth, between Hammond
and the London corporation, and under the antecedent ar-
rangements between the same parties and the other pro-
moters of the scheme, they were from the beginning to be-
come owners of the stock without giving an equivalent
therefor.   As the real purchasers of the property, they owe
to the vendors the balance of the purchase money which
they contracted to pay.   Through the Maryland Company,
which they organized and own, they have become holders

of two hundred and fifty thousand dollars of its bonds that are on their face a first lien upon the property which they bought; and they now seek, as though they were total strangers to the original transaction, and were only connected with the Maryland Company as *bona fide* holders of its bonds, to sell for their own benefit the mortgaged property to the obvious prejudice of the subsequent lien held by the vendors, and created by these same projectors, though as stockholders they owe the company quite as much as they now endeavor in the capacity of bondholders to recover from it. If, whilst they are largely indebted to the company for the stock thus acquired by them without any consideration paid or promised, they be permitted as holders of the first mortgage bonds to sell the property, and thereby strike down the second lien, which they themselves created, and which is held by persons from whom they bought the property, which was bought under stipulations they have not complied with, as will be pointed out further on; the device to which, in the very inception of the undertaking they deliberately resorted "to evade the law and accomplish that which is forbidden," (*Memphis, &c.* v. *Dow*, 120 U. S. 287), will succeed under the very eyes, and still worse, by the potent aid of a Court of Equity. The Hoopers, whilst not seeking by their answer or by their cross-bill to recover a decree against the stockholders for the payment of the second mortgage bonds out of the amounts due on the stock, resist the claim of the holders of the first mortgage bonds to have the property sold so long as the latter owe to the Maryland Company the par value of this unpaid stock. In a word, they invoke the familiar and salutary doctrine that he who seeks equity must do equity. This doctrine, in its broadest sense, may be regarded as the foundation of all equity, and as the source of every rule of equity jurisprudence, since it is undeniable that Courts of Equity do not recognize and protect the equitable rights of litigant parties unless such rights are, in pursuance of the settled juridical notions of morality, based

upon conscience and good faith.   " Whatever be the nature of the controversy between two definite parties, and whatever be the nature of the remedy demanded, the Court will not confer its equitable relief upon the party seeking its interposition and aid, unless he has acknowledged and conceded, or will admit and provide for, all the equitable rights, claims and demands justly belonging to the adversary party, and growing out of, or necessarily involved in, the subject-matter of the controversy."   1 *Pom. Eq.*, sec. 385.

The guaranty given by Poor & Greenough is in these words:  " New York, March 31st, 1890.   Messrs. Wm. J. Hooper *et al.*   Gentlemen:—Referring to a contract between yourselves and Ormond Hammond, Jr., dated February 28th, 1890, wherein it is stipulated that we shall arrange a guarantee that the proposed Maryland Ice Company shall erect additional machinery for manufacturing ice to the extent of one hundred and fifty tons per day, to be placed at once upon the property herein described, we now beg to state that the Arctic Ice Machine Manufacturing Company has entered into a contract for the furnishing of ice machines in accordance with the stipulation, and E. J. Codd Co. have entered into a contract to supply boilers, etc., completing the manufacturing outfit ; which contracts, together with the improvements now being made, will aggregate a cost in excess of $130,000.   These contracts we are assured are from thoroughly responsible people and supply the guarantee which you desire.   We remain, gentlemen, very truly yours, Poor & Greenough. P. S.—New York, April 5th, 1890.   The Maryland Ice Company *has deposited with us the funds called for by the within described contract, and we hereby agree that they shall be applied in accordance therewith.*   Poor & Greenough."   The execution of this guaranty was a condition, and a material condition, upon which the Hoopers were induced to allow the lien of the first mortgage to take precedence over their vendors', or more properly speaking, their grantors' lien for the deferred purchase money.   This is placed

beyond doubt by the statement contained in their report of sales to the Orphans' Court of Baltimore City and by the recital in their deed to the Maryland Ice Company, and by all the circumstances surrounding the whole transaction. By the explicit terms of the guaranty and by the recital in the deed the grantors, the Hoopers, were entitled to have the additional security contemplated by both the guaranty and the deed.    It was upon the faith of the assurance given by Poor & Greenough in the guaranty of April the fifth, that they then had in their hands sufficient funds of the Maryland Ice Company to pay for the betterments and additional machinery, that the Hoopers let in the lien of the first mortgage in favor, as it now turns out, of the very parties who purchased, and now, under the name of the Maryland Ice Company, still hold the property.    If, as we have heretofore held, and there is nothing in the present record to induce a change or modification of our former opinion, the London corporation was one of the promoters of the Maryland Company and was therefore a party to all that was done in the organization of that concern and in the acquisition for it of the property purchased from the Hoopers, then the London corporation was not only aware of the guaranty given by Poor & Greenough, but is bound by it and is affected equally as they are with all the consequences resulting from a deception practiced upon the vendors by means of any false statements contained in that guaranty.    If the holders of the first mortgage bonds secured for themselves, under and by the first mortgage, a priority over the lien representing the unpaid purchase money due to the vendors, and secured that priority by inducing the vendors to let in the first mortgage lien because of the assurance given by Poor & Greenough for and in behalf of all the projectors that they, Poor & Greenough, had in hand sufficient funds of the Maryland Ice Company with which to pay for the stipulated betterments, when in point of fact that assurance was utterly untrue and they did not have those funds in hand at all; it surely cannot be

that a Court of Equity will, at the instance of the holders of a first lien procured by themselves in that way, allow the mortgaged property to be sold to the detriment of the vendors who have been thus deliberately imposed on and deceived. A first lien obtained over the vendors' or grantors' lien by means of a false representation of such a material *inducement leading the vendors to postpone the priority of their purchase money lien* is nothing less than flagitious fraud, which, upon its being unmasked and exposed, no Court will countenance or suffer to prevail. The equity acquired by a party who has been misled is superior to the interest in the same subject-matter of the one who wilfully procured or suffered him to be thus mislead. 2 *Pom. Eq.*, sec. 686. The priority resulting from order of time merely, or that resulting from the superior nature of the equity itself, or that belonging to a legal title may be postponed or defeated in various manners and by various incidents, among which the most important are, notice given to or fraud or negligence of the holder of the interest which would otherwise have been preferred. 2 *Pom. Eq.* secs. 716, 726, 731.

Was the guaranty untruthful? It is clear beyond controversy, that when Poor & Greenough gave the guaranty in the postscript of April the fifth, they did not have and had not had in their hands, and never did have afterwards, and they certainly never did apply, the funds which they declared they then had and that they would thereafter apply in payment for the machinery mentioned in the contracts, to which the guaranty made reference. It was not until that declaration contained in the postscript, heretofore quoted, had been actually reduced to writing and had been signed, that the Hoopers allowed the Maryland Company, which is merely another name for the bondholders, to have the property. It is perfectly clear that a large part of the money borrowed from the London corporation on receiver's certificates, was used to pay in part for this very machinery which Poor & Greenough declared in the guaranty they

then held, sufficient of the Maryland Company's money to pay for. It is further disclosed by the record, that the fifty thousand dollars, which the London corporation claims as a prior lien over the second mortgage bonds by virtue of the Arctic Company's decree that was assigned to the London corporation, as heretofore stated, constitute nearly one-half of the total contract price agreed to be paid to the Arctic Company for the three ice manufacturing machines, which are the identical machines that Poor & Greenough unequivocally declared in the guaranty of April the fifth, they had at that time in their hands the money of the Maryland Company to pay for. We have not overlooked that part of Greenough's testimony where he undertakes to explain away the evident meaning of the guaranty, by saying it was perfectly well understood by the Hoopers and himself that the guaranty only had reference to the *cash* payments to be made for the machinery, and did not include the deferred payments. But this will not stand the test of investigation, for the plain reason that the *cash* payment to the Arctic Company had been made on April the third, two days prior to the date of the postscript, as shown by a statement of expenditures furnished by Greenough himself, and according to Sturgis' diary the payment had been made on March the fifteenth. Whichever statement as to the time of making the payment be accepted, the cash payment to the Arctic Company had been made *before* the guaranty was given; and, therefore, obviously, the declaration that Poor & Greenough had in their hands or on deposit with themselves the funds called for by the contracts, meant, and could only have meant, *all* the funds agreed to be paid for the machinery. If the testimony of Sturgis, as contained in the first record that came before us, be true, the Maryland Company never did have at any time any funds on deposit with Poor & Greenough, and consequensly the statement in the postscript of April the fifth was absolutely false. So far, then, from the guaranty being true, much of the money claimed by the London corporation under the

receiver's certificates, and all of the money claimed by it under the Arctic Company's decree, are sums which ought to have been paid absolutely and unconditionally according to the guaranty, to strengthen the lien of the second mortgage. They were not mere loans which should take precedence over that lien. The attempt to collect them in advance of the second mortgage is a direct, continuing breach of the guaranty.

Now the vendors' lien exists for unpaid purchase money, even though a deed has been executed and possession of the property has been delivered. *Schwartz, Guardian,* v. *Stein,* 29 Md. 112. Perhaps it would be more technically accurate to call the lien a grantor's lien after the deed has been delivered. 3 *Pom Eq.* sec. 1249, note. The vendor's or grantor's lien is not waived by a recital in the deed that the consideration has been paid. *Thompson* v. *Corrie,* 57 Md. 200; 2 *Story Eq.,* sec. 1225, and it prevails against the grantee and his heirs and other privies in estate, and against those claiming as volunteers or even as subsequent purchasers for value if they have notice that the purchase money or any part thereof remains unpaid. *Schwartz* v. *Stein, supra.* The London corporation and Poor & Greenough and their associates created a lien in their own favor— the first mortgage lien—they created it on a condition insisted on by the grantors and inserted in a guaranty and in the deed for the grantor's benefit. They, the parties giving the guaranty and accepting the deed, have violated that condition, and in spite of this they now ask a Court of Equity to enforce their lien thus procured, and to enforce it over and in preference to a grantor's lien, which was only waived or postponed in favor of the first mortgage upon a condition which the holders of the first mortgage bonds made and have flagrantly disregarded. No authority has been cited in support of such a demand as this, and we apprehend none can be found under any system of jurisprudence where the most elementary precepts of ethics pervade the administration of justice. " If the facts relied

on show deception, as where misrepresentations were intentionally made for the purpose of deceiving the defendant, and he relied upon and was deceived by the same, and thereby was induced to enter into a contract which, but for the fact of such deception, he would not have done, a Court of Equity will relieve against the contract and refuse to enforce the same, whether it be accompanied by damage or not." 2 *Warvelle on Vendors*, 752. And this is so upon the theory that a Court of Equity will not make itself an instrument to carry out fraud.

It is, therefore, we think, obvious that these first mortgage bondholders who acquired a prior lien over the grantors' lien by means of the false representations made by Poor & Greenough, in behalf and with the knowledge of all the parties who were intended to take and did take the entire issue of those bonds, should not be allowed to profit by the fraud of which they were guilty ; and that in the distribution of the funds which may arise and be realized on a sale of the mortgaged property, these first mortgage bonds must be subordinated to one hundred thousand dollars of the second ; that is to say, that one hundred thousand dollars of the second mortgage bonds must be first paid in full with their accrued interest and interest on overdue interest coupons before the first mortgage bondholders shall be permitted to receive any part of the proceeds of sale. It is no answer to say that sometime after the first day of July, 1890, the guaranty was complied with to the extent of there being on the premises ice manufacturing machines which produced daily the quantity of ice specified in the contract with the Hoopers. The other features of the guaranty have never been observed. The Hoopers were entitled to rely on the guaranty as it was written, and having waived their lien or deferred it only because the guaranty was given, if the material statements in that guaranty are false and were false when made, and have not been complied with, the deceived and defrauded vendors are not bound by their waiver, and may assert their lien against the land in the hands of those

who were parties to the whole transaction and fully cognizant of all its details.    You cannot hold them to their waiver of their lien except upon the terms on which they agreed to waive it; and you cannot make some other and different terms, and then say to the vendors that these are as beneficial as those actually agreed to.    The vendors are not obliged to accept other conditions, and as those upon which their waiver was founded have been broken, they may reassert their lien in preference to the lien of the first mortgage which will accordingly be displaced.    The *Slide and Spur Gold Mines* v. *Seymour*, 153 U. S. 509; *McDole* v. *Purdy*, 23 Iowa, 277; *R. R. Co.* v. *Lenton*, 20 Ohio St. 401.

We attach no importance to the fact that the bonds held by the Hoopers are declared on their face to be subject to the prior lien of the first mortgage, because that is precisely the relation they would have held, but for the fraud and deception to which we have adverted.    Nor do we consider the action of the commissioners appointed to make partition of the estate of William Hooper, deceased, in affixing no value to these bonds, as at all bearing on the questions before us.

It is perfectly clear that the London corporation cannot assert as against the Hoopers the lien of the Arctic Company's decree.    That decree was obtained, as we have said, against the Maryland Company for the balance of the money due for the very machines, which, under the contract made by Hammond, on February the twenty-eighth, 1890, in behalf of the London corporation and Poor & Greenough, with the Hoopers, were to be placed upon the property by the first day of July.    When ultimately placed there, the Arctic Company obtained a decree for the balance of the purchase money due for them, and the London corporation, one of the original projectors, and, in fact, one of the actual purchasers of these very machines, advanced fifty thousand dollars of the amount decreed to be paid, and took an assignment of the decree.    When the London corporation paid this sum of fifty thousand dollars to the Arctic Com-

pany, it did merely what, as the real purchaser of the machines, it was legally bound to do—it simply paid its own debt; and it cannot, by taking an assignment of, instead of a receipt for, that debt, convert itself from a debtor of the Arctic Company into a creditor of the Maryland Company, as against the second mortgage bondholders, whatever may be its rights, under the assignmeut, as between itself and the Maryland Company.

With reference to the receiver's certificates we have no difficulty.　When the property of private corporations or of individuals has been placed in the hands of a receiver, all expenses for safe keeping and preservation are properly payable out of the income, if there be any, or if there be none, then out of the proceeds of the corpus of the estate when sold.　But this necessary power by no means includes authority in such instances to allow the creation of liens through the medium of receivers' certificates which will take priority over existing antecedent liens.　"Extensive as are the powers of Courts of Equity, they do not authorize a chancellor to thus impair the force of solemn obligations and destroy vested rights.　Instead of displacing mortgages and other liens upon the property of private corporations and natural persons, it is the duty of Courts to uphold and enforce them against all subsequent encumbrances." *Farmers' Loan and Trust Co.* v. *Grape Creek Coal Co.*, 50 Fed. Rep. 481; S. C. 16 L. R. A. 603.　It is only against railroad mortgages that the Supreme Court of the United States has sustained orders giving priority to receivers' certificates, and then only on principles having no application to a mortgage executed by a private corporation owing no duty to the public.　In *Wood* v. *Guarantee Trust & S. D. Co.*, 128 U. S. 421, the Supreme Court said: "The doctrine of *Fosdick* v. *Schull*," 99 U. S. 235, "has never yet been applied in any case except that of a railroad.　The case lays great emphasis on the consideration that a railroad is a peculiar property, of a public nature, and discharging a great public work.　There is a broad distinction between

such a case and that of a purely private concern. We do not undertake to decide the question here, but only point it out." And in *Kneeland* v. *Am. Loan & T. Co. of Boston*,. 136 U. S. 89, the same tribunal, in speaking of the power of a Court of Equity to displace the lien of a railroad mortgage, said: "Upon these facts we remark, first, that the appointment of a receiver vests in the Court no absolute control over the property, and no general authority to displace vested contract liens. Because in a few specified and limited cases, this Court has declared that unsecured claims were entitled to priority over mortgage debts, an idea seems to have obtained that a Court appointing a receiver acquires power to give such preference to any general and unsecured claims. It has been assumed that a Court appointing a receiver could rightfully burden the mortgaged property for the payment of any unsecured indebtedness. Indeed, we are advised that some Courts have made the appointment of a receiver conditional upon the payment of all unsecured indebtedness in preference to the mortgage liens sought to be enforced. Can anything be conceived which more thoroughly destroys the sacredness of contract obligations? One holding a mortgage debt upon a railroad has the same right to demand and expect of the Court respect for his vested and contracted priority as the holder of a mortgage on a farm or lot. So when a Court appoints a receiver of railroad property, it has no right to make that receivership conditional on the payment of other than those few unsecured claims which, by the rulings of this Court, have been declared to have an equitable priority. No one is bound to sell to a railroad company, or to work for it; and whoever has dealings with a company whose property is mortgaged must be assumed to have dealt with it on the faith of its personal responsibility, and not in expectation of subsequently displacing the priority of the mortgage lien. It is the exception, and not the rule, that such priority of liens can be displaced. We emphasize this fact of the sacredness of contract liens for the reason that there

seems to be growing an idea that the chancellor, in the exercise of his equitable powers, has unlimited discretion in this matter of the displacement of vested liens." See also *Bound* v. *South Carolina R. R. Co.*, 50 Fed. Rep. 312; *Fidelity Ins. Trust & S. D. Co.* v. *Roanoke Iron Co.*, 68 Fed. Rep. 623. It would be exceedingly dangerous to concede to a Court of Equity the power to displace, in favor of receivers' certificates, subsisting liens on the property of private corporations, or of individuals. No mortgage lien would ever be secure if it were liable to be postponed to subsequent obligations created by a receiver. If the power exists at all, apart from the case of a railroad mortgage, there is no reason for denying its applicability to every species of mortgage, and a mortgagee might suddenly discover that what he believed to be an ample security, has been utterly destroyed and swept away by intervening liens created subsequently, by an order of the Court. We are unable to give our assent to such a doctrine.

In concluding this opinion it is proper to observe that the ten thousand dollars of second mortgage bonds, which formed no part of the consideration of the purchase from the Hoopers, but which related to another and distinct transaction, whilst subordinate to the first mortgage bonds because not representing unpaid purchase money, are entitled to priority over the Arctic Company's decree in the hands of the London corporation, and to priority over the receiver's certificates.

As a result of the views we have expressed, the *pro forma* decree dismissing the cross-bill will be reversed, and the cause will be remanded, that a decree may be passed directing a sale of the mortgaged property, and giving to the appellants, in the distribution of the funds arising from the sale, a priority over the first mortgage bonds as to one hundred thousand dollars of the second mortgage bonds, with the overdue interest thereon, and interest on that overdue interest down to the day of sale; and likewise giving to the appellants as to said one hundred thousand dollars of second mortgage bonds

with accrued interest, and interest on overdue interest, a priority over the receiver's certificates, and over the Arctic Company's decree in the hands of the London Company, or anyone claiming under it; and further giving a priority as to the remaining ten thousand dollars of second mortgage bonds over the receiver's certificates, and the said Arctic Company's decree.

> *Pro forma decree reversed, with costs above and below, and cause remanded, that a decree may be passed in conformity to this opinion.*

(Decided June 20th, 1895.)