IN THE

# SUPREME COURT OF TENNESSEE

FOR THE

## EASTERN DIVISION.

## KNOXVILLE, SEPTEMBER TERM, 1896.

### RAILROAD *v.* KNOXVILLE.

### (*Knoxville.* November 14, 1896.)

1. CHANCERY PRACTICE. *Rules as to weight of findings of Master and Chancellor and of Court of Chancery Appeals not applicable, when.*

The two well settled rules of chancery practice,.viz.: (1) That the concurrent finding upon a question of fact by the Master and Chancellor has the weight of a verdict in this Court, and will not, therefore, be set aside if there is any evidence to sustain it; and (2) that the findings of facts by the Court of Chancery Appeals are conclusive upon this Court, have no application to a case where the question is one of legal deduction or inference from ascertained and indisputable facts embodied

14 P—1

in the reports of findings. The question, in such case, is one of law, not of fact, in the decision of which this Court is not trammeled by the findings of the other Courts. (*Post, pp. 3–10.*)

Acts construed: Acts 1895, Ch. 76.

Cases cited: Brown *v.* Daily, 85 Tenn., 218; Turley *v.* Turley, 85 Tenn., 251; Turley *v.* Cooley, 3 Leg. Rep., 193; Fitzsimmons *v.* Johnson, 90 Tenn., 418; Dollman *v.* Collier, 92 Tenn., 660; Wilson *v.* Bogle, 95 Tenn., 290; Railway *v.* Mahoney, 89 Tenn., 312; Sparta *v.* Lewis, 91 Tenn., 370; Scruggs *v.* Heiskell, 95 Tenn., 455; Kirkpatrick *v.* Jenkins, 96 Tenn., 85; Citizens', etc., Co. *v.* Seigrist, 96 Tenn., 119; Mobile, etc., Co. *v.* House, 96 Tenn., 552; Austin *v.* Harbin, 95 Tenn., 601; Bank *v.* Evans, 95 Tenn., 705.

2. CORPORATIONS. *Stock subscriptions not collectible, when.*

That a corporation has not issued, and has divested itself of the power to issue, stock certificates in accordance with the contract of subscription, is a good and valid defense to a suit brought against the subscriber by the corporation or its assignee, to recover the amount of his subscription. (*Post, pp. 10–16.*)

3. SAME. *Prior issuance of certificates for entire capital stock.*

That certificates for the entire capital stock had been previously issued to others, and were still outstanding, is a good and valid defense to a suit by the corporation, or its assignee, against a subscriber to collect the amount of his subscription. (*Post, p. 16.*)

Cases cited: 13 Ind., 220; 10 N. Y., 550; 2 Disney (Ohio), 261.

4. SAME. *Subscriber entitled to original stock.*

A subscriber to the orignal stock of a corporation is entitled to the thing contracted for, viz.: Certificates issued directly to himself for original stock, and will not be compelled to accept certificates originally issued to another, or certificates for preferred stock, especially when they have been issued without authority. (*Post, p. 21.*)

5. SAME. *Conversion of subscriber's undelivered shares of stock.*

A corporation is guilty of a wrongful conversion of the undelivered stock certificates of its subscriber, when, after their issuance, it canceled them, and reissued certificates covering the amount to its assignee of the subscription, who proceeded, as

Railroad *v.* Knoxville.

owner thereof, to dispose of the shares and appropriate the proceeds to his own use.   (*Post, pp. 16–22.*)

Case cited and distinguished: Farrington case, 13 Lea, 333.

FROM KNOX.

Appeal from Chancery Court of Knox County. H. B. LINDSAY, Ch.

WASHBURN & TEMPLETON, WEBB & MCCLUNG, and E. T. SANFORD, for Railroad.

J. W. CALDWELL, J. W. SNEED, and J. W. YOE, for Knoxville.

CALDWELL, J.   Powell's Valley Railway Company was chartered under the laws of this State, July 22, 1886, for the purpose of constructing a railway from Knoxville to Cumberland Gap.   No amount of capital stock was prescribed in the charter, but the corporation was, by the charter, authorized to "fix upon the amount of capital to be invested in the enterprise," by and through its "by-laws," to be thereafter adopted.   In pursuance of that authority, the company was capitalized at $1,000,000 of common stock, in shares of $100 each, August 6, 1886. The name of the company was changed to "Powell's Valley Railroad Company," by amendment of its charter, made August 10, 1887.

The Board of Mayor and Aldermen of the city of Knoxville, on the twenty-third day of August, 1887, after the preliminary steps required by Chapter 3 of the Acts of 1887 had been taken, became a conditional subscriber for $225,000 of the company's stock, to be paid for at par, in cash or in bonds of the city, when the railroad should be completed as contemplated by the contract. Three days prior thereto, on the twentieth day of August, 1887, the railroad company employed the Cumberland Gap Construction Company, a New Jersey corporation, to build the railroad, and, as part consideration therefor, assigned and transferred to the construction company all sums theretofore and thereafter paid upon subscriptions made and to be made to the capital stock of the railroad company.

The directors of the railroad company adopted a resolution, on the twenty-third of November, 1887, increasing its capital stock to $1,575,000. Thereafter, on the twenty-ninth of May, 1888, the name of the railroad company was changed to "Knoxville, Cumberland Gap & Louisville Railroad Company," and the directors of the corporation, under the last name, by resolution passed September 12, 1889, resolved to issue $1,300,000 of preferred stock, in shares of $100 each.

November 21, 1890, the Knoxville, Cumberland Gap & Louisville Railroad Company, claiming that the railroad had been constructed according to contract, made application to the Board of Mayor and

Aldermen of the city of Knoxville for payment of the city's subscription. Payment was refused, and, on the twenty-sixth of December, 1890, the railroad company filed the original bill in this cause, tendering therewith $225,000 of its preferred stock, and seeking to compel the specific performance of the city's contract of subscription. The city, answering, set up numerous defenses. Among those defenses was a minute denial that the railroad had been constructed as required by the subscription contract, and a distinct averment that the complainant or its predecessor had, long before the commencement of this action, parted with all of its alleged right and interest in the city's subscription, by absolute sale, transfer, and assignment thereof to the Cumberland Gap Construction Company.

Thereafter the original bill was amended and the Cumberland Gap Construction Company, as the acknowledged owner of the defendant's subscription, was made a joint party complainant with the railroad company.

The Chancellor, on final hearing, was of opinion that the construction company, "as assignee" of the railroad company, was entitled to the relief sought in the bill, and he therefore adjudged that the city issue and deliver $225,000 of its bonds, and that it accept therefor the $225,000 of preferred stock tendered with the original bill.

The city appealed to this Court, and here impeached the Chancellor's decree upon several grounds.

Some of the contentions made by the appellant were, that the railroad company had not performed the work of construction according to material requirements of its contract; that it had disposed of all its common stock, and, for that reason, could not deliver the stock subscribed for by the city; and that the city should, in no event, be required to accept preferred stock, which, it claimed, was invalid and worthless.

After hearing and considering the cause in all of its aspects, this Court, on the twentieth day of November, 1894, by its decree, adjudged that "the complainant, the Knoxville, Cumberland Gap & Louisville Railroad Company, and its predecessor, the Powell's Valley Railroad Company, complied in all respects with its contract with the defendant city, . . . and that it was entitled to demand and receive from the defendant city the issuance of its bonds or payment in cash of the amount of its subscription, on November 21, 1890, on delivering to the defendant city, by the complainant, of the $225,000 of common stock, as provided in the contract between the said railroad company and the defendant city, if at that time said railroad company was and now is able to deliver to said city the stock for which it subscribed." The decree continued: "But because the Court is not satisfied with the proof now in the record that the complainants were able to deliver the stock provided for in the contract at the date of the filing of the bill (De-

Railroad v. Knoxville.

cember 26, 1890), and now (November 20, 1894) it is ordered and decreed that this cause be remanded to the Chancery Court at Knoxville, to be there referred to the Clerk and Master for proof and report on this point. Said report will show the amount and kind of stock issued, when and by whom, and under what authority issued, what disposition was made thereof, and what amount, if any, was unissued and is authorized to be issued."

On being remanded to the Chancery Court, the cause was referred to the Master for proof and report "upon the point and as directed by the decree" of this Court, without other directions. The Master heard additional proof, and filed a report, subdivided into five parts. In the first of these he reported "that the complainants were able to deliver to the defendants, on December 26, 1890, the $225,000 of stock in the Knoxville, Cumberland Gap & Louisville Railroad Company subscribed for by the defendants, and that complainants were also able to deliver said stock on November 20, 1894, and that complainants are still able to deliver said stock to the defendants." Of the other four subdivisions of the report, it need only be said, at this time, that they dealt with the details of the creation, issuance, disposition, and ownership of the two kinds of corporate stock alluded to in the record.

The Chancellor overruled all exceptions, confirmed the report, and pronounced a decree adjudging that the construction company, as assignee of the rail-

road company, was entitled to the relief sought in the bill, and thereupon requiring the city of Knoxville to issue and deposit in Court, within ninety days, $225,000 of its bonds, and to accept therefor certificate No. 87 for $225,000 of the stock of the railroad company.

The defendant appealed from that decree to this Court, and the cause was assigned to the Court of Chancery Appeals, under Chapter 76, Acts of 1895. That Court reversed the decree of the Chancellor, and dismissed the suit.

Both sides have appealed from the decree of dismissal, the complainants on account of thirteen alleged erroneous findings of law and fact by the Court of Chancery Appeals, and the defendant on account of the alleged error of that Court in failing to make five additional findings of law and fact.

It will not be necessary to consider all of these objections and criticisms in this opinion. Only such questions as must control the decision of the cause need be determined, and, in considering these, it will not be important to state all the contentions made on the one side and on the other. No rule of practice is better settled or merits more universal application than that the concurrent findings of the Master and Chancellor upon questions of fact have the same weight in this Court as the verdict of a jury in civil cases. *Turley* v. *Cooley*, 3 L. R., 193; *Brown* v. *Dailey*, 85 Tenn., 218; *Turley* v. *Turley*, *Ib.*, 251; *Fitzsimmons* v. *Johnson*, 90 Tenn., 418;

Railroad v. Knoxville.

*Dollman* v. *Collier*, 92 Tenn., 660. The same rule is applicable, and should be enforced, in the Court of Chancery Appeals. *Wilson* v. *Bogle*, 95 Tenn., 290. The weight of the verdict of a jury in civil cases is such that it will not be disturbed in this Court if there is any evidence to sustain it. *Railway* v. *Mahoney*, 89 Tenn., 312; *Sparta* v. *Lewis*, 91 Tenn., 370; *Scruggs* v. *Heiskell*, 95 Tenn., 455; *Kirkpatrick* v. *Jenkins*, 96 Tenn., 85 (S. C., 33 S. W. R., 819); *Citizens' Rapid Transit Co.* v. *Seigrist*, 96 Tenn., 119 (S. C., 33 S. W. R., 921); *Mobile, etc., Co.* v. *House*, 96 Tenn., 552 (S. C., 35 S. W. R., 562).

Therefore the concurrence of the Master and the Chancellor upon questions of fact will not be disturbed in this Court or in the Court of Chancery Appeals, if there is any evidence to sustain it.

The Court of Chancery Appeals filed an elaborate opinion in this cause. In that opinion, after considering the record at large and stating as a conclusion entirely free from doubt, that neither the railroad company nor the construction company, at any time subsequent to September 15, 1890, had any of the common stock of the railroad company to deliver to the city of Knoxville, the Court went further and found, additionally, that the record contained no legitimate evidence to sustain the concurrent finding of the Master and Chancellor to the contrary.

It should be observed at this point, that "find-

ings of fact" by the Court of Chancery Appeals
are "conclusive," and that "the jurisdiction" of
this Court does "not extend thereto" (Acts 1895,
Ch. 76, Sec. 11; *Austin* v. *Harbin*, 95 Tenn., 601),
and, consequently, that we are without power to re-
view such findings. *Bank* v. *Evans*, 95 Tenn.,
705, 706.

Some of the findings of the Master and some of
the findings of the Court of Chancery Appeals in
this cause are findings of fact, and some of them
are findings of law. Those of the former class,
and those only, fall within the rules just announced
as to the weight of the concurrent findings of the
Master and Chancellor, and as to the conclusiveness
of the findings of the Court of Chancery Appeals.

Since the ability contemplated by the order of
reference involves the legal status of the parties and
of the stock, and not a mere physical situation, the
question whether or not "the complainants were able
to deliver the stock provided for in the contract,"
at the dates specified in the decree of this Court,
is a question of law, arising upon the facts as found,
for the ultimate decision of this Court, untrammeled
by the mere affirmative answer of the Master and
Chancellor, or the mere negative answer of the Court
of Chancery Appeals. Were that question held to
be one of fact, and not of law, the finding of the
Court of Chancery Appeals would be conclusive, and,
as a consequence, the controversy would then be at

Railroad *v.* Knoxville.

an end, and further investigation would be wholly unnecessary.

The object of the reference was to get a report showing "the amount and kind of stock issued, when and by whom, and under what authority issued, what disposition was made thereof, and what amount, if any, was unissued and is authorized to be issued," so that the Court might apply the law to the facts shown, and decide the legal controversy between the parties.

As has been stated, the entire capital stock of the railroad company was $1,000,000, divided into common shares of $100 each, at the time the city of Knoxville became a subscriber for $225,000, and three months thereafter (November 23, 1887) the directors increased the common stock of the company to $1,575,000. All of this stock was subscribed for as follows: Ten shares, one each, by Clarence Cary and nine associates; 750 shares by the American Association, Limited; 2,250 shares by the city of Knoxville; and the residue, 12,740 shares, by the Cumberland Gap Construction Company—in all, 15,750 shares.

Certificates were issued in this order, namely: January, 1887, to October, 1888, Nos. 2 to 11, inclusive, to Clarence Cary and his nine associates, for $100 each, aggregating $1,000; September 1, 1887, No. 12, to the American Association, Limited, for $75,000; December, 1888, to August 19, 1889, Nos. 13 to 25, inclusive, to the Cumberland Gap Con-

struction Company for $98,000 each, aggregating $1,274,000; August 19, 1889, No. 26, for $225,-000, was filled out in the name of the Board of Mayor and Aldermen of the city of Knoxville, but not delivered, as were the others. These twenty-five certificates, 2 to 26, inclusive, covered the whole $1,575,000 stock of the railroad company.

By some means certificate No. 26, intended for the city of Knoxville, after being severed from the stub, was lost or mislaid before delivery; and, on the twenty-third of August, 1889, certificate No. 28 was written in its room and stead, for the same amount and to the same party. No. 26 was subsequently found by the railroad company and canceled. No. 28, though written in the name of "The Board of Mayor and Aldermen of the city of Knoxville," and covering the last of the common stock, was never delivered or tendered to the city.

On the fifteenth of November, 1889, Nos. 28 and 12 were canceled, and the stock represented by them—$225,000 and $75,000, respectively—was combined and "reissued" in certificate No. 31, to "The Cumberland Gap Construction Company" for $300,000. Soon thereafter, January 27, 1890, the construction company procured a reissuance of the stock covered by its certificate No. 31, in certificates Nos. 32 to 60, inclusive, for different amounts, and in the names of different persons, in London, to whom it sold the stock, and from whom there has

Railroad *v.* Knoxville.

been no repurchase by the railroad company or the construction company.

The resolution authorizing the issuance of $1,300,-000 of preferred stock was passed (September 12, 1889) between the filling out (August 23, 1889) and the cancellation (November 15, 1889) of certificate No. 28, originally designed for the city of Knoxville.

When certificate No. 12, owned by the American Association, Limited, and certificate No. 28, intended for the city of Knoxville, were amalgamated, and the stock represented by them was reissued in certificate No. 31, it was the purpose of the railroad company to substitute like certificates of preferred stock for certificates Nos. 12 and 28, and all the railroad company could do toward the actual accomplishment of that end was done.

No. 12 was marked "canceled," and on its stub were written these words: "Reissued No. 31. Same as No. 3, preferred stock; that certificate issued instead." No. 28 was marked "Canceled; not used," and on its stub were written these words: "Reissued No. 31. Preferred stock to be issued instead; this certificate not delivered." The railroad company's ledger of common stock shows, on separate pages, the number of shares taken by each subscriber. Below the entry of shares subscribed for by the American Association, Limited, appears this indorsement: "1889, Nov. 15. Canceled. Preferred stock taken in its stead," and below the entry of shares

subscribed for by the Board of Mayor and Alder-
men of the city of Knoxville appears the following:
"1889, Nov. 15. Canceled. Preferred stock agreed
to be issued in its stead." On the same day the
shares of these two subscribers were transferred to
the account of the Cumberland Gap Construction
Company on the same ledger, and there marked
"full paid," and shown to have been combined into
one certificate. The total subscription of the con-
struction company to the common stock, as shown
by this page of the ledger, then became $1,574,000,
all of which was there marked "full paid," and
was covered by certificates actually issued in the
name of the construction company, and to it deliv-
ered as previously stated herein.

The name of the American Association, Limited,
and that of the Board of Mayor and Aldermen of
the city of Knoxville were by the railroad company
transferred to its ledger of preferred stock, and
there entered as subscribers to that stock in the
same amounts, respectively, as those originally put
down for them as subscribers to common stock.

As the final step in the scheme of transmutation,
the railroad company wrote certificate No. 3, for
$75,000 of preferred stock, in the name of the
American Association, Limited, and certificate No. 4,
for $225,000 of preferred stock, in the name of the
Board of Mayor and Aldermen of the city of Knox-
ville. The former of these certificates was accepted
by the American Association, Limited, in lieu of its

Railroad v. Knoxville.

common stock, but the latter was rejected by the city of Knoxville, and was tendered with the original bill in this cause.

The foregoing facts are undisputed in the record. They appear in more elaborate form in the report of the Master, and documentary evidence referred to by him, as well as in the findings of the Court of Chancery Appeals. From them it follows, as a matter of law, that the railroad company and the construction company had converted the common stock subscribed for by the city of Knoxville before the commencement of this action, thereby rendering themselves unable to deliver the same, and to compel specific performance on the part of the city of Knoxville.

It may be conceded that the railroad company had the legal right to cancel the certificate of common stock intended for the city of Knoxville, before delivery, and thereafter replace it by another certificate for a like amount of the same stock, provided it had a sufficiency of said stock, not issued to other subscribers. That is not this case, however. All the common stock had been subscribed for, and all, except that reserved for the city of Knoxville and covered by certificate No. 28 in its name, had actually been issued and the certificates delivered to other subscribers, when that certificate was canceled and the stock represented thereby "reissued" in certificate No. 31 to the construction company. All of the common stock, except that, had been rightfully appropriated before that time; and

none remained "unissued" and "authorized to be issued"—using the language of the decree of reference—with which Knoxville's stock could be replaced.

The railroad company so recognized the situation, and, as has been seen, took such steps as it deemed essential for the complete substitution of preferred stock, and, having done so, it made out a certificate of preferred stock and tendered that in lieu of common stock. Even the ledger entry of Knoxville's subscription to the common stock was canceled, and the same shares were added to the subscription of the construction company and marked "full paid," like the rest of its stock. Moreover, certificate No. 31, which embraced those shares, was issued, like the rest, to the construction company in its own name, and by it sold, after subdivision, and the proceeds were applied to its own use and benefit.

Before a corporation can recover in an action for subscription, it must show itself to be in a position to issue a proper certificate. "If certificates for the whole capital stock have already been issued, the defendant subscriber, by this fact, may defeat the action to collect his subscription." 1 Cook S. & S., and Corp. L. (3d Ed.), Sec. 192; 1 Spelling Pri. Corp., Sec. 312; citing *McCord* v. *Ohio & Mississippi Railroad Co.*, 13 Ind., 220; *Burrows* v. *Smith*, 10 N. Y., 550, and *James* v. *Cincinnati, Hamilton & Dayton Railroad Co.*, 2 Disney (Ohio), 261.

The complainants, conceding that all the common stock had been issued when this suit was brought,

Railroad *v.* Knoxville.

insist, nevertheless, that the shares intended for the city of Knoxville were delivered, in certificate No. 31, to the construction company as the assignee of Knoxville's subscription contract.

This insistence is in direct and positive conflict with the entries upon the books of the railroad company, and inconsistent with the tender of preferred stock made in the bill. The Master, however, reported that such was the intention of the two companies, and the Chancellor so adjudged. The Court of Chancery Appeals found that there was no evidence to sustain the report on this point, and its finding is conclusive, the question being one of fact. But, had the delivery of the city's stock been intended in the outset as complainants now insist it was, the legal result of the situation, soon established and still existing, would not be different from that already stated. Changing the stock on the ledger and in the certificate from the name of the city to that of the construction company as real owner, making an absolute sale thereof, as such owner, and appropriating the proceeds of that sale to the construction company's own behoof, together constitute a clear case of conversion in law, whatever the design may have been in the beginning.

The full extent of the doctrine of the Farrington case, reported in 13 Lea, at page 333, is that a stock certificate, indorsed in blank, with power of attorney to transfer when delivered as collateral security, may be transferred upon the books of the

14 p—2

company to the name of the creditor so receiving it; and that such a transfer, at his instance, unless intended as an assertion of "a right to the stock in defiance of or inconsistent with the right of" the debtor, "could not, *per se*, operate as a conversion of the stock in such a sense as to make" the creditor liable for its value. Although entirely sound, and having our fullest concurrence, that doctrine is without applicability here. The city of Knoxville made no deposit of its stock with the construction company, nor did it consent to, or even have knowledge of, what the complainants were doing in relation thereto; and, besides, the sale of the stock and use of its proceeds by the construction company was in disregard of and "inconsistent with the right of" the city.

But complainants contend that the construction company continuously retained enough other common stock to meet Knoxville's subscription, and, therefore, that the sale of that represented by certificate No. 28 should not be held to have been a conversion of the city's stock.

To this contention there are two conclusive answers—one that the city could not be required to accept such other stock if so retained; and the other, that in fact it was not so retained.

(1) Such other common stock as the construction company may then have owned had been issued to it as a subscriber, and the city, whose subscription was for original shares, and none other, could, in

no event, be compelled to accept stock that had been so issued to another. Otherwise, the railroad company could as well go upon the market and procure stock with which to meet Knoxville's subscription. Of course that would not be allowable.

The statements made in Sections 2642, 2643, 2644, 2645 of 2 Thompson on Corporations, to the effect that a bailee or pledgee of stock certificates may meet the object of the trust and acquit himself of personal liability by holding and surrendering at the proper time other certificates of similar shares, relates to instances in which the owner may deposit or pledge his certificates, and not to a case like this one, wherein the corporation, upon its own motion, and without the consent or knowledge of the subscriber, cancels his certificate before delivery, and reissues the stock to another person. As between the subscriber and the corporation, the subscriber is always entitled to original shares of the stock to which he subscribed, and the corporation can never force him to receive shares previously and rightfully issued to another subscriber.

(2) The record, as found by the Court of Chancery Appeals, and as we find from abundant competent evidence, discloses the fact that the construction company long since parted with all of its other common stock, and has not regained any part of it.

On November 22, 1889, certificates Nos. 13, 14, 15, 16, 17, 18, 19, and 20, and forty shares of No. 21 were combined and reissued to the same

party, the Cumberland Gap Construction Company, in certificate No. 29, for $788,000. On the same day the balance (940 shares) of No. 21 and the whole of Nos. 22 and 23 were combined and reissued in like manner to the same party in certificate No. 30 for $290,000. January 27, 1890, No. 24 was subdivided and reissued in certificates Nos. 61 and 62, the former to the American Association, Limited, for $12,000, and the latter to the construction company for $86,000.

Under these changes the construction company's holdings of common stock subscribed for and issued to it in the first instance were as follows:

Certificate No. 25 _____$   98,000
Certificate No. 29 _____   788,000
Certificate No. 30 _____   290,000
Certificate No. 62 _____    86,000

          Total_____$1,262,000

All of this stock was, by the construction company, hypothecated to the American Association, Limited, before the filing of the original bill in this cause; and, not being redeemed, was sold, and by that association purchased. That association in turn sold the stock to F. W. Whitridge, and he pledged it to the Continental Trust Company to secure a large loan. Upon default being made, the latter company had the stock sold for its debt, and Whitridge, with others, again bought it, and seemed to be its owners when last mentioned in this record.

January 28, 1895, Whitridge caused certificate

No. 29 to be subdivided and rewritten in certificates Nos. 87 and 88, the former in the name of the Board of Mayor and Aldermen of the city of Knoxville for $225,000, and the latter in the name of the construction company for $563,000. No. 87 was then tendered in this cause, and is the certificate that the Chancellor adjudged the city should accept in payment for its bonds required to be issued. That adjudication is erroneous for the reasons already stated.

Notwithstanding the fact that preferred stock is generally more valuable than common stock, there are three reasons why the city of Knoxville will not be required to accept the preferred stock tendered to it in this cause. In the first place, the subscription contract calls for common stock, and, that being so, only common stock will meet the railroad company's obligation. The city may rightfully refuse to receive anything except that which it contracted for. In the next place, the preferred stock has no validity as between the railroad company and the city. The first capitalization, that to which Knoxville subscribed, being of common stock only, and there being no express authority in the charter for the issuance of preferred stock at a subsequent time, the railroad company had no power to create other stock and give it preference as against any holder of common shares without his or its consent. 1 Mor. Pri. Corp. (2d Ed.), Sec. 463; 2 Thompson's Com. on Corp., Sec. 2244.

And, thirdly, the preferred stock tendered is partly in excess of the limit of that class of stock. The resolution of the directors fixed the preferred stock of the railroad company at $1,300,000. It was written in the following order and amounts:

```
Certificate No. 1, to Construction Co. _____$  700,000
Certificate No. 2, to Construction Co. _____    380,000
Certificate No. 3, to Am. Association, Limited___     75,000
Certificate No. 4, to city of Knoxville _____    225,000
                                                     ─────────
    Total written_____$1,380,000
    Deduct amount authorized_____ 1,300,000
                                             ─────────
    And there appears an excess of _____$   80,000
```

The other three certificates being first written, they appropriated the stock to the extent called for, and left that written for Knoxville to cover the balance, which was only $145,000. Thus it is seen that the certificate tendered to the city, though calling for the true amount, actually included $80,000 of unauthorized excess.

The decree of the Court of Chancery Appeals is affirmed.

---

### DISSENTING OPINION.

BEARD, J. In the conclusion announced by the majority I cannot agree, as I think it is reached in the face of the rule so often emphasized by this Court, that the concurrent finding of facts by the Master and Chancellor is as conclusive as the verdict

of a jury, and, like the latter, will not be disturbed if there is any material evidence to support it. Not only is this rule of practice imposed by this Court upon itself, but the duty of the Court of Chancery Appeals to observe it, has been more than once enforced by a reversal of decrees pronounced by them in disregard of it.

This Court, after a careful and painstaking examination of the record in this cause, at the September term, 1894, pronounced a decree in which every material issue was found in favor of complainants, and, among other things, adjudging that complainants had fully complied with the contract of construction, and were entitled to receive from the city of Knoxville the bonds with which it had agreed to pay off its subscription to the capital stock of the railroad company; but, as some question was made as to the ability of the complainants to deliver the certificates of stock to which the city would be entitled on payment, the cause was remanded to the Chancery Court in order that the Clerk and Master might ascertain and report whether, at the time of the filing of the bill and of the rendition of that decree, complainants were able to make such delivery. In response to the order of reference made upon the procedendo from this Court, the Clerk and Master of the Chancery Court of Knox County reported the fact to be that, at the two dates mentioned, the complainant, the construction company, had possession of and was able to deliver the 2,250 shares of

common stock for which the city had subscribed,
and with this finding the Chancellor concurred.

This was. the fact about which this Court desired
information, and I insist that this concurrence was
binding on this Court and the Court of Chancery
Appeals, if there was any material evidence to sup-
port it.    That there was such evidence is conceded
in the opinion of the latter Court, to be found in
the testimony of Mr. Whitridge, who was a director,
vice president, attorney, and financial agent of the
construction company, and who had particular and
personal charge of the affairs of that company, as
well as of this railroad company, from a very early
period of this enterprise.    They say: "The fact that
Whitridge had in his possession the stock books, and
actually brought in and had canceled certificate No.
29 for 2,250 shares, properly signed by the officers
of the railroad company, taken in connection with
his statements, would, uncontradicted and not changed
by other facts as clearly proven, be evidence strongly
supporting the findings," etc.

It is only by sifting the record, balancing state-
ments, and resorting to documentary testimony which
I think was clearly incompetent, and by rejecting as
unworthy of credit the testimony of the only wit-
ness who testifies from his own knowledge, that that
Court reaches the conclusion, not that there is no
material evidence in support of this finding, but that
"Whitridge's statement was a willful misrepresenta-

tion or a misconstruction of what is shown beyond doubt to have been done.''

It would serve no valuable purpose to go into this record, but I am satisfied that by so doing it could, upon competent and credible testimony, be made apparent that shares of both common stock and preferred stock (as to the lack of power to issue this preferred stock, I agree with the majority), sometimes ear-marked and at other times not, but never subscribed or paid for by anyone else, sufficient to deliver to the city of Knoxville, and kept with a view to such delivery, was always under the control of either the railroad company or of the construction company, to whom the subscription of Knoxville was, at an early day, assigned, or of an assignee of the latter company holding with full knowledge of the city's rights and in subordination thereto, and that, at the dates mentioned in the decree of this Court of September term, 1894, the certificates evidencing the city's share of common stock were in the possession of the construction company, with both physical and legal ability on the part of that company to deliver them to the city.

I also think that it could be made good as a fact that it was never the intention of either of those companies to abandon the contract of subscription of Knoxville, and as a matter of law, that nothing that was done by either amounted to a rescission of this contract or to a conversion of the shares of stock for which the city had subscribed.

No good, however, can be accomplished by such an investigation, as it could not now change the result effected by the majority opinion.

This memorandum of dissent is filed largely for the reason that I fail to discover any legal ground for, or equities in, the defense, which, thus successfully prosecuted, relieves the city of Knoxville of a burden which her citizens voluntarily and by an overwhelming majority vote assumed, for the purpose of securing the railroad which the enterprise of complainants has brought to her doors, especially as when to maintain it, is at this late day to deprive complainants of the fruits of the decree pronounced by this Court, in which every material question was determined in their favor.

Snodgrass, C. J., joins in this dissent.