FIRST NATIONAL BANK OF DEADWOOD *vs.* GUSTIN MINERVA CONSOLIDATED MINING COMPANY and others.

January 14, 1890.

Corporation — Liability of Shareholders to Creditors — Conflict of Laws.—Where a person becomes a stockholder in a corporation organized under the laws of a foreign state, he contracts with reference to all the laws of that state which enter into the constitution of the corporation; hence the extent of his individual liability, as a shareholder, for corporate debts, must be determined by the laws of that state. This liability may be enforced by creditors wherever they can *obtain* jurisdiction of the necessary parties. The remedy, however, is governed by the law of the *forum*.

Same — Issue of Shares as Paid-up, without Full Payment.—Where, by arrangement between the corporation and the shareholders, the stock is issued as fully paid up, without in fact having been paid for to the full amount of its par value, equity will set aside this fictitious arrangement for its payment, and hold the shareholders liable for the amount not actually paid, in favor of creditors who can fairly be presumed to have given credit to the corporation in reliance upon its apparent and professed capital having been fully paid in; but no such trust will be enforced against the stockholders in favor of creditors who have dealt with the corporation with full knowledge of the arrangement by which the stock was to be fictitiously issued as paid up.

**Same—Shares Issued after Debt Accrued.**—If a corporation issue new shares after the claim of a creditor arose, he, not having dealt with the company on the faith of any capital represented by such shares, cannot insist on the contribution by the holders of a greater amount of capital than the corporation itself could claim from them as part of its assets.

This action was brought in the district court for Rice county against the defendant corporation and certain of its stockholders resident in this state, and was tried by *Buckham*, J., who ordered judgment against the corporation for the amount of plaintiff's claim, ($22,-091.84,) but in favor of the other defendants. The plaintiff appeals from the judgment.

*John B. & W. H. Sanborn* and *G. E. Moody*, for appellant.

*Warner & Lawrence*, for respondents.

MITCHELL, J. This action was brought upon a debt of the defendant company, a corporation organized under the laws of Dakota territory, and against the other defendants, citizens of this state, as stockholders, to obtain judgment against the company for the amount of the debt, and against the other defendants for the respective amounts alleged to be due and unpaid on the stock held by them, so far as necessary to satisfy the judgment against the corporation. To dispose of certain preliminary questions raised by the defendants, it may be stated at the outset that it is elementary law that, where a person becomes a stockholder in a corporation organized under the laws of a foreign state, he must be held to contract with reference to all of the laws of the state under which the corporation is organized and which enter into its constitution; and the extent of his individual liability as a shareholder to the creditors of the company must be determined by the laws of that state, not because such laws are in force in this state, but because he has voluntarily agreed to the terms of the company's constitution. It is equally clear, upon both principle and authority, that this liability may be enforced by creditors wherever they can obtain jurisdiction of the necessary parties. This does not depend upon any principle of comity, but upon the right to enforce in another jurisdiction a contract validly entered into. The remedy, however, does not enter into the contract itself;

and for this reason the individual liability of shareholders can only be enforced by the remedies provided by the laws of the *forum.* Hence the question of the liability of the defendant shareholders must be determined by the laws of Dakota, and that of remedy by the laws of Minnesota.

That the remedy resorted to by plaintiff in this case is a proper one is well settled. *Merchants' Nat. Bank* v. *Bailey Mfg. Co.*, 34 Minn. 323, (25 N. W. Rep. 639.) Upon the trial the judge considered it to be one triable by the court, but, on his own motion, submitted a specific question of fact to a jury; but subsequently, considering the verdict as immaterial, he proceeded without regard to it, and found the facts upon all the issues in the case. As neither party claims anything from this special finding of the jury, and as there is no exception which raises the question whether the action was triable by the court or by a jury, the whole case is reduced to the single question whether the conclusions of law are justified by the findings of fact.

Section 413 of the Civil Code of Dakota provides that "each stockholder of a corporation is individually and personally liable for the debts of the corporation to the extent of the amount that is unpaid upon the stock held by him." This is but declaratory of the common law.

The findings of fact, so far as here material, are, in substance, as follows: Prior to November 13, 1886, there had been organized, and were at that date in existence, under the laws of Dakota, two mining corporations, viz., the Gustin Belt Gold Mining Company, and the Minerva Mining Company, of the latter of which the plaintiff, a national banking association of Deadwood, Dak. was a creditor. On the date named the defendant corporation was organized for the purpose and with intention of consolidating the other two companies, acquiring their property, and with the property so acquired carrying on a general mining business. "At the time of the organization of the defendant company, and as the scheme on which the same was based, it was agreed by the parties so incorporating, and by those representing and having authority to act for the two existing companies, that all the mines and mining property of such

two corporations should, upon its organization, be transferred and conveyed to the new, or defendant, company, and constitute its entire capital stock and resources for the prosecution of its enterprise, and be represented in such organization by a nominal capital stock of $2,500,000, divided into 250,000 shares, of $10 each, which should all be deemed and held as represented by the properties so conveyed to it; that 50,000 of said shares should be issued to the former shareholders of each of the two old companies, and the remaining 150,000 shares belong to and constitute the working capital of the new corporation, and be sold under its authority, and on such terms as it should direct; and the proceeds of such sales constitute a fund to pay off the debts on the properties, and develop the mines thereon, and be used generally in the prosecution of the business of the new corporation, for the benefit of all its stockholders. That it was never expected or intended by such corporation, or by those to whom its stock was issued, that any subscription to the capital stock of the new company should ever be made, or that any capital stock should ever be taken, or any capital subscribed for or paid in, except by conveyance to it of the mining properties referred to, and the sale of the stock reserved for its working capital, in open market, for such sum as could be obtained therefor." This scheme was carried into effect by the conveyance to the new or defendant corporation of the properties of the two old corporations, and the issue to their stockholders, according to their respective holdings, of 100,000 shares of the stock of the new company (called in the findings "Old Company Stock") as paid-up stock, and by placing the remaining 150,000 in charge of the board of directors, to be by them sold in the open market for such price per share (not less than 50 cents) as could be obtained therefor. The mining properties of the two old companies conveyed to the new company were not worth to exceed $50,000 cost, and were at the time of this scheme of consolidation considered and estimated as of the aggregate value of $100,000. The new, and defendant, company assumed payment of the indebtedness of the Minerva Mining Company to the plaintiff, which consented to a novation of its debt, accepting the notes of the defendant company in place of those of the old Minerva Company. *This is the claim upon which this ac-*

*tion is brought.* The court also finds "that the payees in said notes named, and the general managing officer of the plaintiff, well knew, at the time of the execution of said notes and of their indorsement and delivery to the plaintiff, all the facts hereinbefore stated, relating to the organization of the defendant corporation and the understanding and plan of its organization, and so dealt with the defendant knowing such matters, and were parties to and interested in the original scheme of the incorporation of the defendant company as in the findings set forth." This must be construed as meaning that the "general managing officer" referred to is the person who transacted the business with the defendant company in taking these notes, and of the benefit of whose action in that regard the plaintiff has availed itself. Notice to him must be deemed notice to the plaintiff.

Returning, now, to the subsequent management of the affairs of the defendant company, the board of directors, pursuant to the scheme of organization, offered for sale in the open market the 150,000 shares remaining in the treasury, as fully paid-up stock, and some of it was bought as such by the other defendants in good faith, for a price exceeding its fair market value, (but not exceeding one dollar per share,) believing it to be fully paid-up stock. This is called in the findings "Treasury Stock." The holders of the old company stock also placed their stock in the market, some of which the defendants also bought, under like circumstances and in the same belief. In March, 1887, the board of directors, pursuant to a resolution adopted by them, distributed *pro rata* among the individual shareholders all the stock remaining unsold in the treasury. Of this the individual defendants received their respective shares, for which they paid nothing. This is called in the findings "Pro rate Stock." The court also finds that none of such defendants ever contracted, promised, or in any manner agreed, or intended to contract, promise, or agree, to pay, on account of such stock, any other or different or greater sum or consideration, unless the law would impose or imply such promise, contract, or agreement from the foregoing facts. The holdings of the defendants consist, in part, of old company stock, in part of treasury stock, and in part of prorate stock.

The contention of the plaintiff is that the defendant shareholders are individually liable, as for unpaid stock subscriptions, for amounts equal to the amount of their stock, less the value of what they have actually paid therefor, viz., nine dollars per share on the old company and treasury stock, for which they paid in value only one dollar per share, and ten dollars per share on the pro rate stock, for which they paid nothing. If these stockholders were indebted to the corporation for unpaid instalments on stock, this debt would be an asset of the corporation which, in case it became insolvent, any creditor might always enforce for the purpose of satisfying his claim. But it is very clear from the facts that the defendant company has no claim against the defendant stockholders. They owe it nothing. As between them and it, the arrangement by which this stock was issued and sold, or given away, as fully paid stock, is entirely valid. But the plaintiff bases its claim upon the familiar doctrine that the capital stock of a corporation is a trust fund for the benefit of its creditors, and that, if shares are not in fact paid up, an arrangement between the corporation and the shareholders that they shall be deemed paid up, although valid between the company and the stockholder, will be ineffectual as to creditors, and that equity will hold the shareholder liable for the amount not in fact paid on his stock, to the extent necessary to satisfy the demands of creditors. We waive consideration of the question (which may, at least, admit of doubt) whether plaintiff's complaint is sufficient to entitle it to such relief. See *Phelan* v. *Hazard*, 5 Dill. 45; Cook, Stocks, § 47; *Scovill* v. *Thayer*, 105 U. S. 143.

The general proposition advanced by plaintiff cannot be controverted, but the principle upon which this trust in favor of creditors rests and is administered must not be overlooked. The whole doctrine that the capital stock of corporations is a trust fund for the payment of creditors rests upon the equitable consideration that the distribution of the capital among stockholders without making adequate provision for the payment of debts, or the issue of fictitiously paid-up stock, is a fraud upon creditors who contract with the corporation in reliance upon its capital remaining intact, or in reliance upon the

professed capital having been in fact paid up in full.    But when the
reason for the rule does not exist the rule itself ceases to apply.    This
trust does not arise absolutely in every case, in favor of every and
any creditor.    It is not true, and no case can be found which holds,
that it is in the power of a creditor in every and all cases, as a mat-
ter of right, to institute an inquiry as to the value or amount of the
consideration given for stock issued as fully paid up, any more than
that it would be his right, in any and every case, to inquire into the
distribution of the capital among the shareholders.    It is only those
creditors who can fairly allege that they have relied, or whom the
law presumes to have relied, upon the amount of capital stock of the
company, who have a right to make such inquiry, or in whose favor
equity will impress a trust upon the subscription to the stock, and set
aside a fictitious arrangement for its payment.    For example, to dis-
tribute the capital among the shareholders without provision for pay-
ing corporate debts would be a fraud on existing creditors, as well as
on such subsequent creditors as deal with the corporation in reliance
upon the assumption that its professed capital remains intact.    An
illustration of this kind is to be found in the very first case in which
what is now called the "American doctrine" was announced by Jus-
tice Story.    We refer to the case of *Wood* v. *Dummer*, 3 Mason, 308,
where a banking association distributed three-fourths of its capital
among its shareholders without providing for the payment of bill-
holders, and the court impressed a trust in their favor upon the capi-
tal in the hands of the shareholders.    So, again, where corporations
have organized and engaged in business with a certain amount of
ostensible and professed paid-up capital, but which was not in fact
paid in, there are numerous cases in which the courts have set aside
the arrangement by which the stock was called "paid-up," and im-
pressed a trust upon the subscription of the shareholder in favor of
subsequent creditors who relied upon, or whom the law would pre-
sume to have relied upon, the apparent and professed amount of
capital.    To this class belong many of the cases cited by plaintiff,
as, for example, *Sawyer* v. *Hoag*, 17 Wall. 610; *Wetherbee* v. *Baker*,
35 N. J. Eq. 501.

While the courts have not always had occasion to state the limitations upon the doctrine that "the capital is a trust fund for the benefit of creditors," yet we think that it will be found that in every case where they have impressed a trust upon the subscription of the shareholders, it has been in favor of creditors becoming such afterwards, and hence fairly to be presumed as relying upon the amount of capital which the company was represented as having. We are referred to none, and have found none, where any such trust has been enforced in favor of creditors who have dealt with the corporation with full knowledge of the facts. The reason is apparent, for in such cases no fraud, actual or constructive, has been committed on such creditors. If a corporation issue new shares after the claim of a creditor arose, it is clear that the latter could not have dealt with the company on the faith of any capital represented by them. Whatever was contributed as capital in respect of the new shares was a clear gain to the creditor's security. So, too, if a party deals with a corporation with full knowledge of the fact that its nominal paid-up capital has not in fact been paid for in money or property to the full amount of its par value, he deals solely on the faith of what has been actually paid in, and has no equitable right to insist on the contribution of a greater amount of capital by the shareholders than the corporation itself could claim as part of its assets. *Coit* v. *Gold Amalgamating Co.*, 14 Fed. Rep. 12, same case 119 U. S. 343, (7 Sup. Ct. Rep. 231.) This doctrine with respect to trusts has no application to a case where a party, like the plaintiff, was cognizant of the whole arrangement under which the stock of the defendant company was issued, and of what was paid or intended to be paid for it, and who accepted a novation of its debt with full knowledge of these facts, and received as great or greater security for it than it had before. To hold otherwise would be to perpetrate a fraud on the stockholders, and not on the creditors.

These views effectually dispose of the question of the liability of the defendants, at least on account of their old company and treasury stock. We think it also logically follows from what we have said that the defendants are not liable to the plaintiff upon their

"pro rate" stock as for unpaid stock subscriptions. This stock had not been issued when plaintiff's debt was contracted. It could not have dealt with the company on the faith of any capital represented by these shares. In fact, it knew that no such capital had been paid in, unless the mining properties of the two old companies can be considered as represented in part by them; and the value of these properties remained the same, and they were equally available to creditors, whether represented by 100,000 shares or 250,000 shares of stock. Under such circumstances, the plaintiff has no equitable right to insist on the contribution of a greater amount of capital by the holders of these shares than the corporation itself could insist on. 2 Mor. Priv. Corp. §§ 832, 833.

Judgment affirmed.

NOTE. A motion for a reargument of this case was denied February 5, 1890.