M. A. BALDWIN, as Receiver of the North Dakota Improvement Company, a Corporation, Plaintiff and Respondent, v. TIMBER INVESTMENT COMPANY et al., Defendants, and J. A. JOHNSON, H. M. Collinson, C. E. Burgess, and Ferd Noecker, Defendants and Appellants.

(176 N. W. 662.)

**Corporations — suit by alleged creditor to recover for worthless stock.**

1. This is a suit by one insolvent and defunct corporation against a similar corporation, and against the subscribers to its capital stock. Judgment was given against the appellants under the statute providing that each stockholder of a corporation is liable for its debt to the amount unpaid on the stock held by him. Appellants subscribed for certain shares of worthless stock, to be delivered on *full payment*, but no stock was ever delivered to them, and they never became stockholders, and their subscriptions were canceled before the action was commenced. The judgment is reversed and the action dismissed.

On Petition for Rehearing filed November 12, 1919.

**Corporations — indebtedness an individual obligation and not debt of corporations.**

2. The evidence is examined and *held* to show that the indebtedness upon which plaintiff's action is based was not an indebtedness of the defendant corporation, but an individual indebtedness of an officer, common to both plaintiff and defendant corporations, and that plaintiff corporation had knowledge of such fact.

**Corporations — defendants who signed subscriptions for stock not liable to one who knew subscriptions to be invalid.**

3. Where one claiming to be a creditor of a corporation extends credit with knowledge of the fact that all of the stock of the corporation has been issued in trust for certain individuals and placed in escrow pending the performance by them of the conditions upon which their ownership shall become absolute, and where such individuals take subscriptions for the resale of their stock running in the name of the corporation, it appearing that all the stock of the corporation was to be issued in exchange for certain property, those who sign

---

NOTE.—The great weight of authority appears to be that one dealing with a corporation with knowledge that the stock has been issued as fully paid in exchange for property at an amount above its actual value cannot hold the stockholders for the difference between the actual value of the property and the par value of the stock, as will be seen by an examination of the cases collated in a note in 7 A.L.R. 972, on creditor's knowledge that stock is unpaid as affecting stockholders' liability.

On liability of stockholders to creditors for corporate debts, see note in 3 Am. St. Rep. 806.

On stockholder's liability on his subscription generally, see note in 9 Am. Dec. 96.

so-called subscription agreements are not liable to such creditors as stockholders under § 4554, Comp. Laws 1913.

**Corporations — creditor with full knowledge of facts cannot claim property exchanged for stock was not equal to par value of the stock.**

4. A creditor who extends credit with knowledge that the stock of a corporation has been issued as fully paid and nonassessable in exchange for property is precluded from subsequently asserting that the property is not the equivalent of the par value of the stock.

**Corporations — liability of parties who subscribed for stock after entire stock has been issued.**

5. Where it is sought to hold subscribers as stockholders under § 4554, Comp. Laws 1913, and it appears that certificates for the whole capital stock had been issued before the alleged subscriptions were taken, defendants are not liable as subscribers.

Opinion filed November 30, 1918. Rehearing denied June 24, 1919.

Appeal from the District Court of Cass County, Honorable *Chas. A. Pollock,* Judge.

Reversed and action dismissed.

*M. A. Hildreth,* for appellant Noecker.

The rule is well settled that one cannot faithfully serve two masters whose interests are diverse. Andrews v. Pratt, 44 Cal. 309; San Diega v. S. D. L. A. R. Co. 44 Cal. 106; Wilbur v. Lunde, 49 Cal. 290 (19 Am. Rep. 645); Cumberland Coal & I. Co. v. Sherman, 30 Barb. 553; Jackson v. Ludeling, 21 Wall. 616.

The making of the notes was a fraud on the stockholder and the burden of proof shifts to the plaintiff to show that there was good faith in the entire transaction. First Nat. Bank v. Flath, 10 N. D. 283; Mooney v. Williams, 9 N. D. 329.

*Harold B. Nelson,* for appellant H. M. Collinson.

If a party dealing with a corporation, with full knowledge of the fact that its nominal paid-up capital has not, in fact, been paid up for in money or property to the full amount of its par value, he deals solely on the faith of what has been actually paid in. First Nat. Bank v. Gustin Minerva Con. Min. Co. 44 N. W. 198; Coit v. Amalgamating Co. 119 U. S. 343, 30 L. ed. 420; Adamont Mfg. Co. v. Wallis, 16 Wash. 614, 48 Pac. 415; Rickerson Roller Mill Co. v. Farrel Foundry Co. 43 U. S. App. 425, 75 Fed. 561; Gogebick Invest. Co. v. Iron Chief Min. Co. 78 Wis. 427, 47 N. W. 726; Cunningham v. Holly, 58 C. C. A. 140, 121 Fed. 721; Robinson v. Bidwell, 22 Cal. 379; State Trust Co. v. Turner, 111 Iowa, 674, 82 N. W. 1029;

Woolfolk v. January (Mo.) 33 S. W. 432; Walburn v. Chenault (Kan.) 23 Pac. 657; Whitehill v. Jacobs (Wis.) 44 N. W. 630.

That a corporation may cancel subscriptions to its shares, where the rights of creditors have not intervened, there can be no doubt. 10 Cyc. 452; Hill v. Silvery, 3 L.R.A. 150; Campbell v. Raven, 42 N. W. 355; Shoemaker v. Lumber Co. 73 N. W. 333.

The issuance of the stock and the payment therefor are concurrent acts, and, until both have been done, the defendant Collison did not become a stockholder, and no liability as such was created. 1 Thomp. Corp. §§ 775, 791, cases there cited.

The shareholder is not liable to creditors after the insolvency of the corporation, unless the circumstances are such that he would have been liable to the corporation itself. Bank v. Mining Co. 44 N. W. 198; Robertson v. Sibely, 10 Minn. 323; Association v. Seligman, 1 Am. St. Rep. 776.

Where officers of different corporations unite in the same individual, whatever knowledge or notice such individual has, as an officer of one corporation, he is bound to have as the officer of the other corporation. 10 Cyc. 1054; Emerado Farmers Elev. Co. v. Bank of Emerado, 20 N. D. 270; Bank v. Moline & S. Co. 7 N. D. 211.

*M. J. Englert,* for appellant C. E. Burgess.

The directors had authority to cancel appellant's subscription, and by so doing release him from future liability to future creditors. This cancelation was binding upon the creditors and upon the corporation itself. Lexington & O. R. Co. v. Bridges, 46 Ky. 556, 46 Am. Dec. 536; Mills v. Stewart, 41 N. Y. 384; Allen v. Montgomery, 11 Ala. 437; Maculy v. Robinson, 18 La. Ann. 619; Cook, Stock & Stockholders, § 127; Thompson's Liability of Stockholders, § 193; New Albany v. Burke, 11 Wall. 96.

*J. J. Weeks,* for appellant Johnson.

Where a person deals with a corporation, with full knowledge of the fact that its nominal paid-up capital has not, in fact, been paid for in money or property to the full amount of its par value, he deals solely on the faith of what has been actually paid in. First Nat. Bank of Deadwood v. Gustin Minerva Con. Min. Co. 44 N. W. 198.

The capital stock of corporations is a trust fund for the payment of creditors, but when the reason for the rule does not exist, the rule itself ceases to apply. Coit v. Amalgamating Co. 119 U. S. 343, 30 L. ed. 420; Rickerson Roller Mill Co. v. Farrel Foundry Co. 43 U. S. App. 452, 75 Fed. 561; Cunningham v. Holly, 58 C. C. A. 140, 121

Fed. 721; State Trust Co. v. Turner, 111 Iowa, 674, 82 N. W. 1029; Walburn v. Chenault (Kan.) 23 Pac. 657; Whitehill v. Jacobs (Wis.) 44 N. W. 630; Young v. Iron Co. 65 Mich. 111, 31 N. W. 814; Woolfolk v. January (Mo.) 33 S. W. 432; Mfg. Co. v. Wallis (Wash.) 48 Pac. 415; Robinson v. Bidwell, 22 Cal. 379; Gogebick Invest. Co. v. Iron Chief Min. Co. 78 Wis. 427, 47 N. W. 726; Adamont Mfg. Co. v. Wallis, 16 Wash. 614, 48 Pac. 415.

The general rule is that the shareholder is not liable to the creditors after the insolvency of the corporation unless the circumstances are such that he would have been liable to the corporation itself. Deadwood First Nat. Bank v. Gustin Minerva Min. Co. 44 N. W. 198; Union Sav. Asso. v. Seligman, 92 Mo. 635, 15 S. W. 630; Burgess v. Seligman, 107 U. S. 20, 27 L. ed. 359; 10 Cyc. 651, 1053, 1054; Emerado Farmers Elevator Co. v. Bank of Emerado, 20 N. D. 270; Bank v. Moline & S. Co. 7 N. D. 211; Chase v. Redfield Creamery Co. 81 N. W. 951.

*A. W. Fowler,* for respondent.

The unpaid balance upon his stock is a statutory asset to which all creditors are entitled to resort. Marshall-Wells Hardware Co. v. New Era Coal Co. 13 N. D. 396; German Mercantile Co. v. Wanner, 25 N. D. 483; Easton Nat. Bank v. American Brick Co. (N. J.) 8 L.R.A. (N.S.) 2711, 64 Atl. 917; 4 Thomp. Corp. § 4801.

The books of the corporation are admissible to show prima facie when parties became stockholders and the amount paid or unpaid upon their stock. Fish v. Smith (Conn.) 47 Atl. 711.

Payment of stock subscription is an affirmative defense, and must be alleged and proved by defendant. Hargadine v. Breedlove (Okla.) 130 Pac. 267.

No particular form of acceptance is essential in order to constitute an offer to become a stockholder a binding contract. It is sufficient that the corporation, by its acts, shows that it equivocally accepts the offer. 10 Cyc. 384; Jackson v. Sabie, supra.

The appellants being purchasers of stock, and therefore stockholders, it is wholly immaterial that only intermediate stock certificates, and not final stock certificates, were delivered to them. Jackson v. Sabie supra; Holland v. Duluth (Minn.) 68 N. W. 50; Balbraith v. McDonald, L.R.A.1915A, 465 and note.

ROBINSON, J. This suit was commenced in the summer of 1916. It is a suit by one defunct and bankrupt corporation against another of

the same kind, and against several persons who were induced to subscribe for the worthless stock of the Timber Company. Before the action was commenced each corporation was legally dead and buried. It had ceased to exist and its charter had been canceled. However, judgment went against the Timber Company for some $40,000, against its subscribers,—Noecker, $5,115; Burgess, $1,390; Collinson, $112; Johnson, $667.

The case presents a wealth of material in the form of testimony, account books, and exhibits. The principal actor was Edward Wilson, who quit the state and went to New York city in January, 1913. In each corporation he was the organizer, president, manager, treasurer,— and the whole thing. Receiver Baldwin was nearly always the treasurer or director in one or both of the corporations, but Wilson never allowed him or any other person to handle the money, give checks, or keep the bank books. The first corporation was organized in 1906, with a stock capital of $100,000; the second, in 1909, with a capital of $1,500,000. The real purpose of each corporation was to sell blocks of worthless stock and investment certificates at 100 cents on the dollar, and to put the money into the pockets of Wilson. This he knew well how to do, and he did it.

The complaint is on a note to this effect:—

Fargo, May 27, 1906.

On the 1st day of December, 1912, for value received, I promise to pay to the order of the North Dakota Improvement Company $29,- 345.50, with interest at 8 per cent.

[Signed] Timber Investment Company,

By E. A. Wilson, Pres.

Then it avers that each personal defendant is a stockholder of the Timber Investment Company, and has not paid for his stock.

By answer each one denies that he is a stockholder, and avers that in 1910, by fraud and deception of said companies, their agents, and managers, he was induced to subscribe for certain shares of worthless stock, and that in the year 1912 the subscription was duly rescinded and canceled.

The default judgment was given against the Timber Company without proof that Wilson had authority to make the note. It was given on an affidavit that on July 6, 1916, the summons and complaint were served on H. H. Aaker, secretary of the company. But in truth Aaker was not secretary of the company. It had ceased to exist and

its charter was canceled February 1, 1915. In January, 1913, Wilson left the company for good, taking with him R. M. Farmer, who had been the real secretary. The company at once collapsed. The books fail to show that it ever did another particle of business, and fail to show that Aaker was ever secretary. But the only purpose of the judgment against the defunct Timber Company was to lay the foundation for a judgment against the other defendants.

As it appears, each appellant subscribed for a few shares of stock, made a part payment, and refused to pay the balance. Each received from the Timber Company a certificate, giving the number of shares, the sum paid, and a promise to deliver the stock *upon full payment*. The by-laws of the company provide that "no certificate of stock shall be issued until full payment." Ex. A–15. A sample of the real stock certificate is in evidence. It is an imposing and magnificently engraved document, surmounted by a glorious spread eagle. It shows that the person therein named is a stockholder, and that his stock is fully paid. (52) Stockholders of a corporation are persons who *hold stock*. They are limited partners, because each has a right to share in the profits and losses, and, by his vote and otherwise, to direct and control the affairs of the company. In dealing with a corporation the creditors have a right to assume that the members are honest, and have paid, or will pay, for their stock which they have accepted and received. And the creditor who does not know to the contrary may assume that a corporation of $1,500,000 is not organized to swindle those who subscribe for stock. By statute each stockholder of a corporation is liable to honest creditors to the amount unpaid on his capital stock. Comp. Laws, § 4555. Now the questions here present are few and simple:—

(1) Is the Wilson Improvement Company a creditor—an honest judgment creditor—entitled to maintain this action? The answer is: No, no, no.

(2) Are the appellants' stockholders? No.

(3) Were the subscriptions obtained by fraud and without consideration? Yes, yes.

(4) Were the subscriptions canceled before this action was commenced? Yes, yes; most assuredly.

Certain it is that in December, 1911, and December, 1912, the cancelation of each subscription was duly entered on the books of the company, both on the journal and in the ledger; and in like manner numerous other cancelations were made, amounting to some $30,000.

While the books of the corporation are not necessarily evidence in its favor, they are certainly evidence against it.

Wilson knew of good reasons for canceling the stock. He knew, and all his agents and managers knew, that the stock was a mere gold brick; that the Timber Company had no property, save a worthless option on some timber licenses. He knew that no person had sub-scribed for or made payments on the stock, without some deceptive allurments and promises. He knew how he had contracted to exchange large blocks of stock for timber licenses which he did not deliver, and how he had, at the same time, acted as buyer and seller. Ex. A-62. It may well be that, in dealing with his pals, Wilson was not as generous as he ought to have been, and yet they must have had some crumbs from their master's table. Baldwin paid for his ten shares of stock only $100. He was allowed for commissions a credit of $625, and he was permitted to pay the balance by merely adjusting it. He testifies: "I don't owe the company anything. I have adjusted the matter." Q. "How did you adjust it?" A. "Nothing more than by my statement." (75) What amazing innocence! Manifestly there is no consideration for the stock subscriptions, and the law will not enforce a promise to pay good money for nothing. 13 C. J. 368; Shellberg v. Wilton Bank, 39 N. D. 530, 167 N. W. 723. The promise to purchase the timber stock was in no way different from a promise to purchase a regular gold brick. The enormous one and a half million charter which the Timber Company displayed was itself a fraud and a gold brick. It cost $775, and it represented nothing of value.

Indeed it is passing strange that any court should entertain a suit on such a contract. In such a case the quibbles and fine theories of the law are of no avail. It is time for courts and counsel to know that the law must not be used to rob men of their property.

Counsel say the answer of Noecker is merely a general denial, and he did not appear at the trial; but that is no reason for asking the court to aid in robbing Noecker. The judgment against him is manifestly unjust. The Timber Company has had $1,500 of his good money for nothing,—for absolutely nothing. To hold that he must give up for nothing a further sum exceeding $5,000 would be a lasting reproach to the court.

Judgment reversed and action dismissed, with costs.

BRUCE, Ch. J. (concurring). I concur in the result of the above and in the opinion of Mr. Justice BIRDZELL in its entirety.

GRACE, J. I concur in the result.

CHRISTIANSON, J., did not participate.

## On Petition for Rehearing.

BIRDZELL, J. A petition for rehearing has been filed, which is addressed principally to some propositions advanced in a short concurring opinion prepared by the writer and concurred in by the then Chief Justice Bruce. The statements in the opinion to which they petition for rehearing is directed were made with reference to the facts in the particular case, although this perhaps does not sufficiently appear. Since the petition for rehearing was filed, the whole case has been submitted on the briefs to District Judge Hanley, sitting in the place of Mr. Chief Justice Christianson, disqualified. In order to obviate misunderstanding and to make the basis for the concurrence of the writer more clear, as well as to more adequately express the views of my brother Hanley, who participates in the decision, it is deemed to be both necessary and proper to substitute this opinion for the short opinion previously filed.

This action is brought by M. A. Baldwin as receiver of the North Dakota Improvement Company against the Timber Investment Company to recover upon two notes of the latter. Certain individual defendants are joined, against whom it is sought to enforce the alleged stockholders' liability. The action is brought under the authority of § 7997, Compiled Laws of 1913, which authorizes any creditor of a corporation seeking to charge stockholders on account of any liability created by law, to maintain an action for that purpose in the district court. The liability sought to be enforced is that which is expressed in § 4554, Compiled Laws of 1913. The section, in so far as it is germane to the questions that will be hereinafter discussed, is as follows: "Each stockholder of a corporation is individually and personally liable for the debts of the corporation to the extent of the amount that is unpaid upon the stock held by him. Any creditor of the corporation may institute joint or several actions against any or all of the stockholders of a corporation whose shares have not been fully paid up, and in such action the court must ascertain the amount that is unpaid upon the stock held by each stockholder and for which he is liable, and several judgments must be rendered against each in conformity therewith." The action is here for trial de novo upon separate appeals from a judgment finding defendants J. A. Johnson, H. M.

Collinson, C. E. Burgess, and Ferd Noecker personally liable for unpaid subscription balances. There is a judgment against the Timber Investment Company for $40,460.67, and against the appealing defendants as follows: J. A. Johnson, $667.40; H. M. Collison, $1,112; C. E. Burgess, $1,390; and Ferd Noecker, $5,114.20. The facts disclosed by the record are substantially: Sometimes in 1906 the North Dakota Improvement Company, hereinafter referred to as the Improvement Company, was organized and it continued to transact business until a receiver was appointed in 1913, the exact date being immaterial. Among the papers that came into the possession of the receiver were the notes in suit. The principal note is for $29,-345.50. It is dated May 22, 1912, and due December 1, 1912, with interest at the rate of 8 per cent payable semi-annually. The other note is for $1,370, dated December 27, 1912, and due on demand, with 7 per cent interest.

Prior to October, 1909, a syndicate, composed of several individuals, among whom were Baldwin, the receiver in this action, E. A. Wilson, then an officer of the Improvement Company, and H. G. Otis, and others unnecessary to mention, had contracted in the name of Wilson and Otis for the purchase of some seventy-four timber licenses and grants on the island of Vancouver, in British Columbia, and had made some comparatively small initial payment or payments thereon. This contract was made with the Timber Investment Company of Washington.

In October, 1909, the defendant corporation, Timber Investment Company of North Dakota, which will hereinafter be referred to as the Investment Company, was organized, and at the first meeting of stockholders there were represented eight stockholders each subscribing for ten shares. The by-laws provided for the election of nine directors, and these eight stockholders elected themselves and one absent person as a board of directors. At the first directors' meeting E. A. Wilson was elected president; Wall, vice president; Hopp, secretary; and Baldwin, the receiver, plaintiff in this action, treasurer. The authorized capital of the corporation was one and a half million dollars, one million common stock and five hundred thousand preferred. It seems that the first business of this corporation after its organization was to contract with its own directors and officers for the purchase from the syndicate of the timber contract previously referred to. The facts in connection with this purchase and assignment will be more fully stated later on.

Upon the trial of this action certain defendants, including the Investment Company, defaulted, and the plaintiff's attorney moved for judgment by default against all defaulting defendants. The court, however, after granting the motion as to the Investment Company, reconsidered its ruling, and required the plaintiff to put in his evidence, which was done with the understanding that the individual defendants who had answered, and who were contesting liability, were to be given the benefit of every defense which they had, regardless of whether it was included in their answers or not,—the understanding apparently being that they should be allowed to amend their answers to include any defense that might be established on the trial. It also appears that all of the defendants who were represented at the hearing contested liability on the ground, among others, that the Improvement Company was not in reality a creditor of the Investment Company. The plaintiff introduced the notes sued upon, the so-called subscription contracts of the various defendants, and the stub stock books, which evidenced the issuance of what are termed "intermediate stock certificates." These certificates simply certify that the subscriber is entitled to so many shares of the stock of the Investment Company upon full payment of the par value and the surrender of the certificate. At this stage of the case both the plaintiff and defendants rested, and the latter moved to dismiss. It appears that the plaintiff relied upon the case of Hargardine-McKittrick Dry Goods Co. v. Breedlove, 36 Okla. 768, 130 Pac. 267, in support of the prima facie case claimed to have been made by the evidence referred to. The case apparently holds that in a creditor's suit to recover a stockholder's liability it is sufficient for the plaintiff to prove the subscription, whereupon it would devolve upon the defendant to prove payment or other circumstances which would negative liability. The trial judge, however, at this stage of the case, took the matter in his own hands, and suggested to plaintiff's counsel that additional proof be offered. Also that, inasmuch as this was an action in which the receiver was plaintiff and various other beneficiaries interested, he would ask that the account books of the Timber Investment Company be introduced. The books were then brought forward. The merits of this controversy are brought out in the books and in the testimony which followed their production. The facts so established will be fully presented as we consider the contentions of counsel upon this appeal.

Although the defendants in this case were represented by able counsel, it is clear on the record before this court that they were greatly

handicapped in their efforts to establish the facts. Their clients did not hold certificates of stock in the company, and were not stockholders in the full sense of the word on the books of the corporation. They had not enjoyed either the privilege or the opportunity of examining the books of the corporation. Perhaps the extent to which they were thus handicapped in establishing the facts is best illustrated by an incident occurring at the trial. Counsel who took the most active part in the trial of the case represented a defendant by the name of Theodor M. Aamodt, who, upon his subscription application for $200, described himself as a common laborer. It appears that he subscribed on April 9, 1910, and is credited upon the subscription blank with a payment of $20 cash. According to the theory upon which the plaintiffs originally brought and presented the case to the district judge, they were entitled to a judgment against him for $180 and interest, although it appears affirmatively in the ledger account that this common laborer had made instalment payments extending over a period of approximately one and a half years, which left his account balanced by full payment long before this action was brought. A judgment against him, therefore, on the prima facie case attempted to be made by the subscription and the stub book would have been a gross fraud. This was prevented only through the somewhat accidental introduction of the books in evidence. The books of the defendant Investment Company came from the possession of the plaintiff, which makes the circumstance of the fraud referred to all the more significant. The conduct of the plaintiff, in thus attempting to get a judgment against one defendant whose account was fully paid, is indicative either of absolute dishonesty or of gross incompetency. At any rate, it is an invitation to a court of conscience to examine with the closest scrutiny the entire transaction upon which the judgment which the plaintiff seeks, and which he obtained in the lower court, must rest.

The plaintiff comes into court as a creditor, and relies upon its right as a creditor to compel the individual defendants to contribute their proportionate shares of the capital of the defendant corporation. It would doubtless be conceded that, before being entitled to recover anything, the plaintiff must establish that the Improvement Company was in fact a creditor of the Investment Company. And furthermore it must appear, before the plaintiff can recover, that it comes into court with clean hands as a creditor seeking to enforce an obligation which, as between the individual defendants and the plaintiff, exists in equity and good conscience. Through foreclasure the Improvement

Company has already acquired for $500 all the property that the Investment Company ultimately obtained for the many thousands contributed by the gullible subscribers in the manner hereinafter described.

Our first inquiry, therefore, is: Is the plaintiff Improvement Company in reality a creditor of the Investment Company?

The notes which are in evidence may be considered prima facie evidence of indebtedness. Inasmuch, however, as the Investment Company did not appear and defend, we are not, as to it, concerned with the judgment; but the appellants do have a right to question that indebtedness as it affects them. We are satisfied from an examination of the record that the principal note sued upon ($29,345.50) dc 3 not represent an actual indebtedness of the Investment Company; that it was not given on the day of its date, to wit, May 27, 1912, and did not fall due on December 1, 1912. And we are further satisfied that this note does not represent any cash advanced by the Improvement Company to the Investment Company in May, 1912, or in any other month of 1912, or, for that matter, at any other time. The books make it perfectly plain, we think, that the note in question was given on Novemebr 5, 1912, as a renewal note, renewing a supposed indebtedness of more than two years standing. The circumstances upon which we base these findings are: First, the absence of any positive testimony which would go to indicate that the note represented a cash loan to the Investment Company made at or about the time the note is dated. Baldwin, the treasurer of both companies, testifies that he had no knowledge of any draft that was drawn on account of the Investment Company for the amount of the supposed loan, although he says that he was consulted upon the question of sending the proceeds of the Timber Investment Company of Washington, and he says that he is "pretty reasonably sure" that the payments of the Timber Investment Company of North Dakota went to the Washington Company, because he got credit for these payments upon a settlement later made by him. He is the only witness who testifies concerning these transactions, and dates are sadly lacking in his testimony, as is also assertion of positive knowledge. Second, the books of the Investment Company disclose no such transaction as that evidenced by the note in May, 1912. But, on the contrary, they do evidence the renewal of an obligation for exactly the face of this note on November 5, 1912. Entries appear both in the journal and in the bills payable account of the ledger in which the bills payable account is charged on November 5th with the face of this note, and on the same day Improvement Company notes amount-

ing to $27,115.51 are noted as being paid. Tracing, in the bills payable account, the Improvement Company notes which were thus retired in November, 1912, by the giving of the new note, we find that the notes retired represent a supposed obligation incurred upon March 29 and 30, 1910. In other words, stating the facts chronologically: In March, 1910, the Investment Company, which had then been organized only a few months, apparently obtained upon its notes to the Improvement Company cash to the amount of $27,400, and these notes were never paid, but remained a liability of the company until November 5, 1912, when the note for $29,345.50 was given as a renewal.

The consideration, then, for the principal note in suit takes us back to March, 1910; and a further examination of the books reveals the fact that the Timber Investment Company did not obtain the benefit of that consideration; that it was not intended that the company should receive the benefit; and that the Improvement Company, acting through its officers, knew these facts. The loan was in fact one for the benefit of Wilson and Otis, and the Improvement Company was aware of the fact when the loan was made. These facts are likewise established by the books, which speak more eloquently than the most positive testimony of the apparently incompetent receiver. In fact, though the receiver in this action was treasurer of both the Improvement Company and the Investment Company when these transactions all took place, and though he is the only witness brought in to enlighten the court upon the facts, he leaves the most important matters almost entirely to inference. His testimony throughout leaves the impression that he was a sort of Esau responding to the voice of Jacob in the person of Wilson. Turning to the minute books of the Investment Company we find that on March 28, 1910, a meeting of the directors was held, at which the president and secretary were authorized to negotiate the loan of such amounts and at such terms as are necessary to care for payments due upon the contract for the timber limits purchased through Wilson and Otis. Turning, then, to the cash book of the two following days we find these entries:

CASH.

DR.

1910

To Bills Payable

| | | |
|---|---|---:|
| Mar. 29 | To N. D. Improvement Co. 1 year @ 8 % | $10,000 |
| " " | To N. D. Improvement Co. 18 months @ 8% | 10,000 |
| | To N. D. Improvement Co. 6 months @ 8% | 5,000 |

" 30     To E. A. Wilson, on demand ©c 8%  ·               1,000
"  "     To N. D. Improvement Co. on demand ©c 10%          2,400

These items also open the bills payable account in the ledger, and are the ones evidencing the indebtedness which has never been paid as hereinbefore indicated.   (According to the ledger, Wilson got his money back the following month.)   Turning next to the journal, it shows that on March 30 and 31, 1910, transactions were had requiring entry in the ledger account of Wilson and Otis, trustees.   These transactions involve items of about $29,600.   On the 31st, payments were made to Thurston, president, amounting to $31,000, $6,000 of which was for interest on a $200,000 loan from October, 1909, to April 1, 1910, a loan which apparently antedated the organization of this corporation.   Thurston was connected with the company from which the timber licenses were being purchased.   Turning next to the treasurer's account, it shows that on the 30th and 31st there was deposited in the treasurer's account in the Commercial National Bank of Fargo, $29,-500 in two separate items, $1,100 and $8,400, respectively.   And that on the same dates on which the deposits were made like sums were checked out.   These circumstances alone indicate that the money that went to Thurston was the Improvement Company money that had been obtained by the use of the name of the Investment Company in the manner indicated.   But there are other circumstances pointing in the same direction.   The treasurer's account shows that prior to this time there had been no other large deposits made, and that the account had at all times prior been practically in a state of balance; that is, such deposits as were made had been used to pay current expenses.   Still a further fact pointing in the same direction is that up until April 1, 1910, the total so-called stock subscriptions, both common and preferred, amounted to less than $52,500, and that this had been obtained upon an instalment basis requiring 10 per cent at the time of subscription, so, beyond question, it was the Improvement Company money that was transmitted to Thurston in the latter part of March, 1910. And equally without question is the fact that whatever authority the president and secretary of the Investment Company had to borrow money was exercised by borrowing from the Improvement Company.

Having traced the date of its origin in March, 1910, it remains to be seen whether this indebtedness can be regarded as the indebtedness of the Investment Company.   This involves a consideration of the contract under which the Timber Investment Company was to become owner of the timber licenses hereinbefore referred to.   A resolution

passed at a special meeting of the directors on November 19, 1909, authorized the purchase from Wilson and Otis of the timber grants, as follows:

"On motion duly made and carried, the following resolution was adopted: Resolved, that this company purchase of Edward A. Wilson and Herbert G. Otis, the following described timber licenses and Crown Grant, to wit: (Describing the grant).

"And pay therefor, with and by the issuance to said Wilson and Otis, of the ten thousand (10,000) shares of common stock and five thousand (5,000) shares of the preferred stock of this company, authorized by its charter, upon the following terms and conditions:

"All of the above-mentioned stock of this company shall be issued and delivered to the Commercial Bank of Fargo, North Dakota, as trustee, in certificates covering one (1) share or more, as said Wilson and Otis may direct, and said bank shall, from time to time, deliver to said Wilson and Otis, or upon their order, certificates of shares of said stock, on the payment to it of seventy-five dollars ($75) for each share so delivered, and all the moneys so received by said bank shall be paid to the Timber Investment Company of Washington, upon the order of said Wilson and Otis, to be applied upon the purchase price of the timber licenses and Crown Grant, hereinbefore described, and when said Wilson and Otis deliver to said bank the timber licenses of British Columbia, in the Dominion of Canada, hereinbefore described, then said bank shall deliver to said Wilson and Otis, or upon their order, all of the shares of stock then remaining in the hands of said bank, and the president and secretary are hereby directed to issue and deliver said stock in conformity to this resolution.

"The following directors voted in favor of the adoption of said resolution, namely: E. A. Wilson, H. G. Otis, A. L. Wall, M. A. Baldwin, G. M. Hopp."

Beneath the minutes of this resolution appears the following acknowledgment of receipt of the stock described and acceptance of the trust created:

Received the stock described in the foregoing resolution, and the trust therein expressed is hereby accepted.

Dated this 22nd day of November, A. D. 1909.

Commercial Bank of Fargo,

By M. A. Baldwin, President.

The minutes also contain a copy of the contract of assignment, dated November 22d, which corresponds with the recital in the minutes above, except there is added a provision whereby Wilson and Otis agree that

they will, within two years from date, procure and deliver to the company the timber licenses and Crown Grant described free and clear of all taxes, assessments, and renewals to the date of such delivery; and that, in the event they shall be unable to procure a delivery of the same, they will deliver or cause to be delivered an amount of capital stock of the Timber Investment Company of Washington, at par, equal to one fifth the money received by said bank and paid on the order of the parties of the first part to the Timber Investment Company of Washington. On the following day, apparently, the foregoing resolution and transaction were ratified.

From this resolution and the copy of the contract which is spread at length upon the minutes, it appears that the obligation to make payments upon the timber licenses was that of Wilson and Otis, trustees of the syndicate, and not that of the Timber Investment Company. For they had bound themselves to deliver within two years the licenses and grants free and clear of all taxes, assessments, and renewals to date of delivery. The added stipulation for the delivery of stock in the Washington Company in case of inability to deliver the licenses makes the obligation with respect to the renewals none the less the obligation of Wilson and Otis. So, assuming to be true the testimony of Baldwin, to the effect that the money borrowed from the Improvement Company was credited on the licenses, it was a credit that Wilson and Otis should have secured, and is one which never, in fact, inured to the benefit of the Timber Investment Company. The use of the name of the Timber Investment Company in this connection, therefore, could only have been for the purpose of giving to a private loan an appearance of being for the benefit of a corporation.

There can be no question but what all of the facts stated above were known to the Improvement Company. Baldwin, as stated, was treasurer of both companies; Wilson was the president of the Investment Company and secretary of the Improvement Company. Wall, who was present at the directors' meetings of the Investment Company authorizing the above transaction, was a director in both companies. Baldwin himself admits that the officers of the Improvement Company were fairly conversant with the affairs of the Timber Investment Company. In equity, therefore, the basic obligation upon which the individual judgments against the appealing defendants is based does not exist as a corporate obligation. The plaintiff, who from the beginning had knowledge of this fact, is not in a position to assert the contrary as against the appealing defendants. If the plaintiff corporation

has lost money on this transaction, it has lost it by reason of the fact that it allowed its own irresponsible officers to borrow it to meet their personal obligations.

There are still further reasons why the appealing defendants in this case are not liable. Reference to the transaction in which the Investment Company obtained the assignment of the contract for the timber licenses discloses that all of its stock was turned over to and receipted for by the Commercial National Bank of Fargo. It was to hold that stock in trust for Wilson and Otis, and to deliver it upon their order upon payment of $75 for each share to the Timber Investment Company of Washington. In short, the North Dakota Timber Investment Company agreed to take the timber licenses as the equivalent of its full capital stock of one and half million dollars, and, to enable Wilson and Otis to raise the money with which to make the future payments on the licenses, they were to sell the stock and, for each share sold, pay to the Washington Company $75 on the licenses. The total amount to be paid did not exceed $300,000. If. Wilson and Otis, then, had raised this money themselves, they would have been the owners of all the stock of the one and a half million dollars in the North Dakota Company. In short they were the sole subscribers to the original capital, and were pursuing a plan whereby, by making a resale of their stock, they were enabling themselves to share a profit which would be measured by the difference between the total cost of the timber licenses and their full value, and at the same time they were obtaining from third persons through the resale of their stock the necessary capital to secure this profit to themselves. That this is the character of the transaction appears so clearly from the minute book that any presumption that might arise from the subscriptions running in favor of the corporation is entirely overcome. This transaction was likewise known to the officers of the Improvement Company, because its own officers were participating in it. When boiled down, it amounts to this: The directors of the Investment Company transferred all its stock for what they considered an equivalent in property.

It is well settled that when the directors of a corporation authorize the stock to be issued as fully paid and nonassessable in exchange for property deemed by them an equivalent, any subsequent creditor who takes with knowledge of the fact is not in a position to assert that the value received for the stock is less than par. 10 Cyc. 467–478, though a different rule might obtain as to creditors generally.

In the case of First Nat. Bank v. Gustin Minerva Consol. Min. Co.

42 Minn. 327, 6 L.R.A. 676, 18 Am. St. Rep. 510, 44 N. W. 198, Mr. Justice Mitchell had occasion to consider the principle last above mentioned in connection with the exact statute upon which liability is predicated in the instant case. It was then § 413 of the Civil Code of Dakota. It was there held by a unanimous court, concurring in his opinion, that a creditor of a corporation who had full knowledge of the fact that its stock had been issued in exchange for other stock not representing in actual value 100 per cent or par was in no position to enforce the statutory stockholder's liability. And it is also held that new shares issued after the claim of the particular creditor arose cannot add to the creditor's right, except as he may be fortunate enough to avail himself of the added capital actually represented by them. That is, the capital actually received in exchange for the new shares. Says Justice Mitchell (page 334): "So, too, if a party deals with a corporation, with full knowledge of the fact that its nominal paid-up capital has not in fact been paid for in money or property to the full amount of its par value, he deals solely on the faith of what has been actually paid in, and has no equitable right to insist on the contribution of a greater amount of capital by the shareholders than the corporation itself could claim as a part of its assets. . . . This doctrine with respect to trusts has no application to a case where a party, like the plaintiff, was cognizant of the whole arrangement under which the stock of the defendant company was issued, and of what was paid or intended to be paid for it, and who accepted a novation of its debt with full knowledge of these facts, and received as great or greater security for it than it had before. To hold otherwise would be to perpetrate a fraud on the stockholders, and not on the creditors."

So, in the case at bar, taking the facts as they appear in the books of the Investment Company, and as they must have been known to the plaintiff Improvement Company, all of the stock of the Investment Company was exchanged for the licenses, and delivered to the bank as trustee, pending payment on part of it up to $75 per share by Wilson and Otis, or the delivery by them of the timber licenses free from renewals and assessments. The Improvement Company must be held to have loaned its money on the strength of the credit of Wilson and Otis, supported by their ability to secure purchasers of their stock. If any fraud has been perpetrated upon the plaintiff creditor, therefore, it has been perpetrated by the individuals, the present receiver among them, who thus disposed of the stock of the Investment Company, and not by the subsequent subscribers upon whom Wilson and Otis depended to finance their own purchase. See Coit v. North Carolina

Gold Amalgamating Co. 14 Fed. 12, 119 U. S. 343, 30 L. ed. 420, 7 Sup. Ct. Rep. 231; 2 Morawetz, Priv. Corp. 2d ed. § 829.

It follows from what has been said that these defendants are not in fact subscribers to the capital stock. The case was not tried below on that theory, apparently for the reason that the attorneys lacked an opportunity to investigate the facts as they actually existed in the books. It is a well-established proposition that a subscriber's liability cannot be enforced where the corporation does not control the stock to be issued to him in exchange for the payment of the subscription. In the instant case, the bank has receipted for the entire stock, and, as previously stated, Wilson and Otis could secure the delivery of the whole amount to them upon the payment of $75 per share for enough shares to pay out on the timber licenses, the balance coming to them without any payment whatsoever. It would thus appear that the entire capital stock has been once subscribed by Wilson and Otis, and that certificates for the full amount have been issued and receipted for by the bank. See McCord v. Ohio & M. R. Co. 13 Ind. 220; Burrows v. Smith, 10 N. Y. 550; Knoxville, C. G. & L. R. Co. v. Knoxville, 98 Tenn. 1, 37 S. W. 883; Leigh v. Chattanooga, R. & C. R. Co. 104 Ga. 13, 30 S. E. 381. The following language of the supreme court of Tennessee in the Knoxville Case, 98 Tenn. 1, 37 S. W. 883, partly quoted from Cook on Stock & Stockholders, § 192, as applied to this situation, is pertinent: "If 'certificates for the whole capital stock have already been issued, the defendant subscriber, by this fact, may defeat the action to collect his subscription" (Citing).

In both the Georgia and Tennessee cases cited above, there are facts strikingly parallel with some of the facts in the case before us. In the Georgia case the subscription was allowed to be enforced, but it was for the reason that the certificates had been placed with financial agents in blank for delivery to subsequent subscribers.

All that has been said in the foregoing opinion regarding the note for $29,345.50 is also properly applicable to the other note for $1,370, for the reason that the testimony shows that the second note is an interest note.

For the foregoing reasons we are of the opinion that the stockholder's liability expressed in § 4554 of the Compiled Laws of 1913 does not exist in favor of this plaintiff. The petition for rehearing is denied.

ROBINSON, J., and HANLEY, District Judge, sitting in place of CHRISTIANSON, J., disqualified, concur.